## DOUGLAS, STUART & FORREST V. SMITH.

1. **Chattel Mortgage** : ON CRIBS OF CORN TO SECURE ADVANCES: CONSTRUCTION. I. & M. were grain buyers at country towns, and bought and cribbed large quantities of corn with money advanced by D., S. & F., who were commission merchants in Chicago. As soon as a crib was filled, they would make to D., S. & F. a "crib receipt," or chattel mortgage, on the corn in that crib. Each of these "receipts" conveyed the corn, and provided as follows : "And, in further consideration of the advances made and to be made by said D., S. & F. for our account, we further agree, upon the request of D., S. & F., to procure said corn to be shelled and shipped to them, or their order, as they may direct, at our expense. * * * Said D., S. & F. to sell said corn, and, from proceeds of sale, pay freight, inspection, insurance, their advances on said corn, with interest at eight per cent. on the same, and upon margins upon contracts that may be made for its sale, and commissions of not less than one-half cent per bushel for selling, and account to us for balance of proceeds, if any. The conditions of this sale and transfer are such that, should the undersigned cause to be paid to the said D., S. & F., on or before the fifteenth day of June, 1881, all moneys and accounts due by the undersigned to the said D., S. & F., with interest * * * including commissions * * * on the above-described corn, and on other grain which we have agreed to consign to D., S. & F., or pay commissions on, then this sale and transfer shall be void." *Held—*

(1) That these receipts were not given merely as security for the money advanced to buy the corn in the particular crib described in the receipt, but that they were issued in pursuance of the general enterprise, which was to buy one hundred thousand bushels of corn, and sell it on the market ; and each crib receipt was security for all advances made by the plaintiff, including margins advanced upon sales for future delivery.

(2) That the word "due" in the writing was not to be taken in its technical sense, but that I. & M. were liable to all indebtedness to plaintiffs, which they in good faith incurred in carrying out their part of the enterprise, whether due on the fifteenth of June, or afterwards ; and that such indebtedness covered any proper outlay made necessary thereafter to protect them, or I. & M., from any legal contracts made for the sale of the corn.

2. **Gambling Contracts :** SALES OF CORN FOR FUTURE DELIVERY. Where country grain buyers had a large quantity of corn in cribs, and they made sales from time to time, through Chicago commission merchants, for future delivery, of No. 2 corn, but, fearing that their corn would not grade No. 2, and hoping that it would improve with age, they bought in and resold, intending to deliver the corn to cover their sales, *held* that the transactions were not illegal, so as to defeat their brokers in the collection of margins advanced for them.

*Appeal from Cedar Circuit Court.*

FILED, MAY 17, 1888.

THIS is an action of replevin to recover possession of about ten thousand bushels of corn, which, at the commencement of the suit, was stored in three cribs at Garrison, in Benton county. The plaintiffs claim the right to said corn by reason of certain crib receipts or chattel mortgages upon the same, made by Ingersoll & Moulton, dealers in grain. The defendant was sheriff of Benton county, and levied attachments on the corn at the suits of certain creditors of Ingersoll & Moulton. There was a trial by jury, and a verdict and judgment for the defendant. Plaintiffs appeal.

*Mills & Keeler*, for appellants.

*Nichols & Burnham* and *Boies, Husted & Boies*, for appellee.

ROTHROCK, J.—I.  The plaintiff is a corporation organized under the laws of Iowa, and having its principal office at the city of Cedar Rapids.  In 1880 and 1881, the corporation owned and operated mills, and was engaged in the manufacture of oat-meal at Cedar Rapids and Chicago.  In connection with this business, they also carried on a commission business on the Chicago Board of Trade in 1880 and 1881.  The partnership of Ingersoll & Moulton was engaged in buying grain at Laporte, in Black Hawk county, and other towns in that neighborhood.  They bought grain quite extensively at Laporte, Washburn, Mount Auburn and Garrison. Their purchases included large quantities of ear-corn, which they cribbed, shelled and shipped to Chicago, and other markets.  In the latter part of October, 1880, they made an arrangement with the plaintiffs at Cedar Rapids, by which the plaintiffs undertook to furnish Ingersoll & Moulton with money to enable them to buy and crib one hundred thousand bushels of corn.  It was not expected by the parties that the corn would be shelled and shipped as it was bought, but that it should be cribbed, and held during the winter, and marketed in the spring.  Under this arrangement, Ingersoll & Moulton bought and cribbed from one hundred to one hundred and ten thousand bushels of corn during the fall and winter after the contract was made.  Ingersoll & Moulton were not mere adventurers.  They had been for some time engaged in the same business, and had some capital of their own, but not sufficient to carry on the business without credit, or the benefit of advances of money to pay for the corn as it was bought from the farmers of the country.  To secure the plaintiffs for the money advanced to buy the corn, it was agreed that, as each crib was filled, Ingersoll & Moulton should make and deliver to the plaintiffs crib receipts or chattel mortgages upon the corn in the crib.  As the form of these instruments presents an important question in the case, we will here give a copy of one of them:

1. CHATTEL mortgage: on cribs of corn to secure advances: construction.

" Laporte City, Iowa, December 15, 1880.

" For and in consideration of money advances made to Ingersoll & Moulton by Douglas, Stuart & Forrest, of Chicago, Ill., the receipt of which is hereby acknowledged, we do by these presents sell and convey to the said Douglas, Stuart & Forrest all our right, title and interest in seven thousand bushels of good sound ear-corn, stored in good covered crib, numbered four (4), and located on lots five, six and seven, block eleven, belonging to Burlington, Cedar Rapids & Northern Railway Company, and situated in the town of Garrison, county of Benton, state of Iowa; the said corn being at the time of this sale and transfer the property of the undersigned, and the same being free from all claims or incumbrances. And, in further consideration of the advances made and to be made by said Douglas, Stuart & Forrest for our account, we further agree, upon the request of Douglas, Stuart & Forrest, to procure said corn to be shelled and shipped to them, or their order, as they may direct, at our cost and expense, and until such shipment will keep said corn insured against loss by fire for the sum of two thousand dollars; loss, if any, payable to Douglas, Stuart & Forrest, as their interest may appear. Said Douglas, Stuart & Forrest to sell said corn, and from proceeds of sale pay freight, inspection, insurance, their advances on said corn, with interest at eight per cent. on the same, and on margins upon contracts that may be made for its sale, and commissions of not less than one-half cent per bushel for selling, and account to us for balance of proceeds, if any. The conditions of this sale and transfer are such that, should the undersigned cause to be paid to the said Douglas, Stuart & Forrest, on or before the fifteenth of June, 1881, all moneys and accounts due by the undersigned to the said Douglas, Stuart & Forrest, with interest on the same at the rate of eight per centum per annum, including commissions of one-half cent per bushel on the above-described corn, and on other grain which we have agreed to consign said Douglas, Stuart

& Forrest, or pay commissions on, then this sale and transfer shall be void.

"C. T. INGERSOLL,

"G. F. MOULTON."

These receipts and mortgages were duly acknowledged and recorded. At the time of entering into the arrangement, Ingersoll & Moulton had some corn in crib, and they ordered the plaintiffs, as their brokers, to sell for them, on the Board of Trade in Chicago, corn for delivery in May and June following. These sales were made from time to time, during the fall and winter, and upon their face would appear to be for a much larger amount of corn than Ingersoll & Moulton would have to deliver in fulfillment of their contracts of sale made through the plaintiffs; but, although these figures look large, it appears that many of the transactions amounted merely to extensions of the time of delivery of the corn actually contracted to be sold. In other words, at the request of Ingersoll & Moulton, their contracts were changed over so as to be performed at a later date. This was done by buying in on the Board of Trade and selling out again. These extensions of time were sometimes attended with a profit, and at other times loss, to Ingersoll & Moulton. They appear to have been made necessary by the fact that they apprehended that their corn would not grade No. 2, and this apprehension afterwards proved to be well founded as to a greater part of it. The result was that Ingersoll & Moulton became in debt to the plaintiffs and others; and on the eleventh day of November, 1881, George F. Moulton, one of the members of said partnership, went to Cedar Rapids for the purpose of informing the plaintiffs of the condition of the affairs of the firm, so that they might protect themselves. The result of this interview was that on the next day the plaintiffs took actual possession of the corn in controversy; it being in certain cribs at Garrison, in Benton county, and on which they held three crib receipts or chattel mortgages, a copy of one of which we have above set out. Two days afterwards, the defendant, who is sheriff

of Benton county, levied attachments on the corn at
the suit of other creditors of Ingersoll & Moulton.
The plaintiffs replevied the corn from the sheriff.    No
question is made as to the validity of the debts upon
which the attachments issued.    A short time after the
suit was commenced, the parties entered into a stipula-
tion by which the corn was shelled, shipped and sold ;
and the contest at the trial involved the rights of the
parties to the proceeds arising from the sale.    We have
not thought it necessary to set out the pleadings upon
which the cause was tried.    They are quite voluminous ;
but, as is usual in the trial of causes, as the trial pro-
ceeded, the rights of the parties upon the merits of the
controversy turn upon a few well-defined and pivotal
questions.    Upon the face of these crib receipts, and in
view of the fact that the plaintiffs were in open and
notorious possession of the corn before and at the time
the attachments were levied, it would appear that, the
receipts or mortgages not having been taken up, the
plaintiffs were entitled to hold the corn until the
receipts were paid.    The defendant claims ( 1 ) that
nothing was due on these receipts or mortgages, but
that they were fully paid and satisfied before the suit.
was commenced ; ( 2 ) that the real indebtedness to the
plaintiffs is founded upon certain gambling transactions
upon the Chicago Board of Trade, and are therefore
not the subject of any valid claim against Ingersoll &
Moulton.    We do not deem it necessary to state any
other questions, because, as we think, the rights of the
parties depend upon the determination of those above
stated, without more.

Upon the question as to whether there was anything
due upon the receipts, the defendant relies upon a
statement of account made by the plaintiffs to Ingersoll
& Moulton on the first day of July, 1881, by which it
appeared that there was $14,031 due to the plaintiffs.
It is conceded that, after this date, plaintiffs received
from Ingersoll & Moulton the sum of $15,925.06, and
defendant claims that this amount was, by the direction
of Ingersoll & Moulton, to be applied in payment of

the crib receipts or mortgages.    Upon the face of it, this appears to be payment in full, and we think the jury was by this statement of account induced to return a verdict, which, when tested by the other evidence in the case, and a proper construction of the crib receipts, was wholly without the support of any evidence.    It is important to determine what species of indebtedness these receipts and mortgages were intended to and did secure.  . Counsel have argued this question elaborately ; and, without following the arguments, we will briefly state what we believe to be their true construction.    They recite that Douglas, Stuart & Forrest shall, from the proceeds of the sale of the corn, "pay freight, inspection, insurance, their advances on said corn, with interest on the same at eight per cent., and on margins upon contracts that may be made for its sale, and commissions of not less than one-half cent per bushel for selling."    The condition of the mortgage is that if the mortgagors shall pay to plaintiffs, "on or before the fifteenth day of June, 1881, all moneys and accounts due,    *    *    *    with interest on the same at the rate of eight per cent. per annum, including. commissions of one-half cent per bushel *on the above-described corn, and on other grain which we have agreed to consign to said Douglas, Stuart & Forrest*, or pay commissions on, then this sale and transfer shall be void."    It is plain from the last clause, which we have italicised, that these receipts were not merely given as security for the money advanced to buy the corn in the particular crib described in the receipt.    All of the receipts were issued in pursuance of one general enterprise, which was to buy one hundred thousand bushels of corn, and sell it on the market, and each crib receipt was security for all advances made by the plaintiffs ;  and  these  advances  included  margins advanced upon sales to be for future delivery.    This is a most significant provision of the contract, when taken in connection with the acts of the parties from the very inception of the enterprise until its disastrous termination.    On the very day that the arrangement was made

for the advances, Ingersoll & Moulton ordered a sale of corn for delivery in May following; and, as we have stated, they continued to make such orders, and extended the time of delivery, from time to time, some-times at an advantage and sometimes at a loss. The court instructed the jury that the crib receipts secured only such "moneys and accounts as were due and unpaid on the fifteenth of June, 1881, and except advances which might be made or were made, either before or after said date, by plaintiffs on contracts made for the sale of the corn which was covered by said crib receipts." This instruction was, we think, erroneous and misleading, in making any allusion to moneys and accounts due on the fifteenth of June. The error con-sists in construing the receipt as meaning that the money must be actually due; that is, payable on or before that day. In view of the evidence in the case, this was wrong. It appears, without conflict or dispute in the evidence, that the whole amount of the indebted-ness was extended, by the act of the parties, beyond the fifteenth of June; and, of course, the extension of the debt carried with it an extension of the security or mortgage. And we think this and other instructions given by the court to the jury did not properly define the meaning of the contracts made for the sale of the corn covered by the crib receipts. It would appear from this instruction, or the jury might well have been led thereby to believe, that the sales for which margins might be required, as provided in the receipts, were contracts in which the plaintiffs sold for Ingersoll & Moulton a crib of corn at Garrison, Benton county, or at any of the other places that the corn might be located.

And, in this connection, we will allude to a special interrogatory submitted by the court to the jury, which is vulnerable to the same objection. It is as follows: "Were the contracts of sales, in lots of five thousand bushels or upwards, which plaintiffs claim to have made on account of Ingersoll & Moulton on the Board of Trade of Chicago, and upon which they claim to have

paid losses, contracts for the sale of the same corn upon which Ingersoll & Moulton issued crib receipts to plaintiffs? A. No." The jury could, of course, answer this question in the negative, and would be led thereby to find a general verdict for the defendant. The vice of the instruction and interrogatory is in confining the jury to the identity of the corn in the cribs. As we shall presently see, the validity of the sale did not depend upon the question of the identity of the corn. But to return to the question of payment: The court should have instructed the jury that the word "due" was not to be taken in its technical sense, and that Ingersoll & Moulton were liable for all indebtedness to the plaintiffs which they in good faith incurred in carrying out their part of the enterprise, whether due on the fifteenth of June or afterwards, and that such indebtedness would cover any proper outlay made necessary thereafter to protect them or Ingersoll & Moulton from any legal contracts made for the sale of the corn. All of the evidence, without conflict, shows that this is the way the parties themselves construed the contract. Moulton in his testimony claims that he turned this corn over to the plaintiffs upon these receipts ; and, about the time this suit was commenced, Ingersoll wrote a letter to the plaintiffs, in which he stated that " about one-half of the corn at Garrison is in cribs, over which you still hold certificates. We suppose you will have to replevy to assert your claim, and this will go pretty well towards paying your claim. We deeply regret this turn in affairs. It leaves us flat. This resulted from (1) bad weather preventing our getting out the corn when it should have gone to the market; (2) the losses on short sales, and in other ways. We have realized for a month that it would be difficult for us to get out whole ; but, looking for fair weather, we hoped to get our corn out, pay you, and arrange for balance. The fearful weather has prevented this, until our creditors became impatient and gobbled us."

II. The only other question we deem it necessary to determine is whether the sales of corn made by plaintiffs

2. GAMBLING contracts: sales of corn for future delivery. as brokers in behalf of Ingersoll & Moulton were gambling contracts within the meaning of the law. The plaintiffs contend that there was no evidence justifying the finding that the contracts were of that character. In determining a question of this kind, much importance is always attached to the circumstances surrounding the parties. It is conceded that Ingersoll & Moulton had a large amount of corn for sale. It was not in a condition for immediate delivery. They ordered the plaintiffs to make sales for them from time to time, and to extend the time of delivery, which, as we have seen, was done by buying in and selling out, and gave the appearance of selling more corn than Ingersoll & Moulton had or expected to have. But they pursued the very course which all country grain dealers do in buying corn in the fall and winter. They sold for future delivery. All of their correspondence with the plaintiffs shows this to be the fact. It is true that Ingersoll states, in his testimony as a witness, that he did not intend to deliver the corn in the cribs to fill these contracts; but his testimony is entitled to no consideration, because his own correspondence with plaintiffs shows that he did intend to ship the corn to cover the contracts. And, then, his declaration of his intention may have been literally true, and still not a material fact in the case, because it was evidently founded upon the idea that it was not the intention to deliver the identical corn in the cribs. As we have seen, this is not the proper test to be applied to transactions of this kind. It would be foolish to suppose that either of the parties to such a sale intended that Ingersoll & Moulton would shell this corn, put it in the cars, ship it to Chicago, and that the plaintiffs, as their commission men, would call on the purchaser, and measure the corn out to him. Everybody knows that the vast grain transactions of this country could never be conducted in that way. Warehouse and elevator receipts have come to be the evidence of title to the property which they represent, and men do business according to the known usages of trade. Besides, a

man may make a lawful contract for the sale of property for future delivery without being the owner of the property sold at the time of the contract. He may go into the market, purchase the property, and perform his contract. Ingersoll & Moulton were not mere novices or gamblers on the Board of Trade. The evidence shows beyond controversy that they intended to deliver the corn in their cribs, to cover the sales which they ordered the plaintiffs to make for them. The only obstacle in the way was that the corn would not grade up to the contracts which plaintiffs made for them, and this was the cause of changing the contracts so as to make the delivery come later in the summer. They hoped that the corn might, as the season advanced, improve in quality ; but the fact that the property they had did not meet the requirements of their contract did not render the contract void. "A dealer has a clear right to sell, and agree to deliver at some future time, that which he then has not, but expects to go into the market and buy ; and it is equally clear that the parties may mutually agree that there need not be a present delivery of the goods, but that such delivery may take place at some other time ; and that there need not be an actual manual possession given, but a symbolical one, as by delivery of warehouse receipts according to custom, is also beyond dispute." *Gregory v. Wendell*, 39 Mich. 340 ; *Logan v. Musick*, 81 Ill. 419. This case presents no such facts as this court has heretofore held to be sufficient to authorize a finding that alleged sales were gambling transactions. In *First Nat. Bank v. Oskaloosa Packing Co.*, 66 Iowa, 41, the evidence was plain and undisputed that the defendant did not intend to deliver any property, nor any warehouse or elevator receipts. It knew, and its brokers knew, that it did not have the ability to do so. In the case at bar, the property sold was not only such as the sellers had the financial ability to buy, but it was in the very line of their business to sell corn, and they actually had on hand large quantities for sale. And we think that the theory upon which

the case was tried, the constant reference to the identical corn in the cribs, was all wrong. The whole correspondence between the parties shows that the corn in the cribs was held to cover and protect the contracts, and this was sufficient, no matter how it was disposed of. We conclude that there was no evidence upon which to find a verdict that these contracts were illegal.

III. There are other questions discussed by counsel which we do not deem it necessary to determine. So far as they relate to rulings of the court upon the admission and exclusion of evidence, we discover no error. The plaintiffs claim that the corn was turned over to them by Moulton, not only to cover the receipts, but to include all of the indebtedness arising out of all the contracts. We think the court properly instructed the jury on this feature of the case ; and, as there was a conflict in the evidence touching the question, we would not feel at liberty to disturb the verdict upon that ground.

For the errors above pointed out, the judgment will be

REVERSED.