JOHN C. MORRISSEY, APPELLANT, v. GEORGE BROOMAL ET AL., APPELLEES.

FILED OCTOBER 4, 1893. No. 5125.

1. **Equitable Actions**: FORECLOSURE OF LIEN OF WAREHOUSE RECEIPTS. An action to foreclose a lien of certain warehouse receipts on grain in storage, pledged to secure the payment of a promissory note, is a suit in equity.

2. ————: COUNTER-CLAIM BY DEFENDANT: RIGHT TO JURY TRIAL. A defendant in an equity suit is not entitled, as a matter of right, to a jury for the trial of a counter-claim for damages, which he has voluntarily pleaded in the case.

3. **Contracts**: RESERVATION OF RIGHT TO TERMINATE. Ordinarily where the right to terminate a contract on notice is reserved in the instrument itself, without fraud or mistake, and with the actual knowledge and consent of all the parties thereto, such reservation is valid, and the exercise thereof will be enforced by the courts, if not contrary to equity and good conscience.

4. ————: USURY: QUESTIONS OF FACT. Where by the terms of a written contract a commission merchant in Chicago advances money to a grain dealer in Nebraska, for which the latter agreed to pay interest at the rate of seven per cent per annum, and also agreed to pay the commission merchant a stated sum as commissions for the sale of all grain purchased with the money borrowed, whether the borrower sold his grain through the commission merchant or elsewhere, *held*, (1) that the contract was not on its face usurious; (2) that whether it was intended as a

cover for usury, or an honest contract for commission business in connection with the use of the money, was a question of fact.

5. **Gambling Contracts:** COMMISSION MERCHANTS: GRAIN DEALERS: INTENTION OF PARTIES: QUESTIONS OF FACT: EVIDENCE. Wanzer & Co., commission merchants in Chicago, made a written contract with one Morrissey, a grain dealer in Nebraska, by which they agreed to lend the latter money to be used by him in the purchase of grain in Nebraska. This contract contained the further provision that the "said Morrissey further agrees to sell through said Wanzer & Co., for future delivery in Chicago market, corn equal to the amount of ear corn purchased with funds furnished by Wanzer & Co., which sales may be changed from month to month, as may be directed by said Morrissey. For the purchase and sale of this grain said Morrissey agrees to pay said Wanzer & Co. one-sixteenth of one cent per bushel per month on all corn on hand at the close of each and every month, which shall cover the charges of change from month to month; and if purchases and sales of this character are made in any month in excess of the amount of corn on hand, the charges of such purchase and sale, or sale and purchase, shall also be one-sixteenth of one cent per bushel." *Held*, (1) the contract on its face was not one from which it appeared that the parties intended to speculate in grain upon the market without actual delivery by settling the differences, and was therefore not a gambling contract; (2) whether the parties honestly intended to deal in actual grain, or use the contract as a cover for betting on the rise and fall of its price in the market, was a question of fact to be determined from what the parties did in pursuance of the contract and other competent evidence.

APPEAL from the district court of Lancaster county. Heard below before HALL, J.

The opinion contains a statement of the case.

*G. M. Lambertson,* for appellant:

The court erred in overruling the motion to transfer the case to the law docket and impanel a jury for the trial of the same, and erred in refusing to impanel a jury in the equity court to try the issues of fact. (Code, secs. 100, 101, 280, 281; *Dale v. Hunneman,* 12 Neb., 225; *Lamaster v. Scofield,* 5 Id., 149; *Betts v. Sims,* 25 Id., 184; *Dohle v.*

*Omaha Foundry*, 15 Id., 437; *Davis v. Morris*, 36 N. Y.,
572; *Ladd v. James*, 10 O. St., 438; *Keller v. Wenzell*, 23
Id., 579; *Greason v. Keteltas*, 17 N. Y., 499.) The con-
tract is non-forfeitable under the thirty-day clause. The
party claiming forfeiture must show complete readiness to
perform. (*Post v. Garrow*, 18 Neb., 687; *Nebraska City
v. Nebraska City Hydraulic Gas Light & Coke Co.*, 9 Id.,
343; 2 Kent's Com., p. 555; *People v. Gosper*, 3 Neb.,
285; *Barton v. Fitzgerald*, 15 East [Eng.], 541; *Merrill
v. Gore*, 29 Me., 346; *Newlean v. Olson*, 22 Neb., 719;
Jones, Chattel Mortgages, sec. 430; *Anderson v. Holmes*,
14 S. Car., 162.) When commissions are exacted for
money advanced, aggregating, with the interest charged, a
greater rate than the rate allowed by law, there being no
other service rendered than the loan of the money, the
contract stipulating for such commission and all notes
given in payment of sums advanced under such contract
are usurious and illegal. (*Brown v. Vredenburgh*, 43 N.
Y., 295; *Merchants Exchange Nat. Bank v. Commercial
Warehouse Co.*, 49 Id., 640; *Olmstead v. New England
Mortgage Security Co.*, 11 Neb., 493; *New England Mort-
gage Security Co. v. Hendrickson*, 13 Id., 157; *Rosa v.
Doggett*, 8 Id., 48; *Richards v. Kountze*, 4 Id., 205;
*Stark v. Sperry*, 40 Am. Rep. [Tenn.], 47; *Chester v. Ap-
person*, 4 Heisk. [Tenn.], 639; *Fanning v. Dunham*, 9 Am.
Dec. [N. Y.], 283; *Harman v. Lehman*, 5 So. Rep. [Ala.],
203; *Cleveland v. Loder*, 7 Paige Ch. [N. Y.], 557; Tyler,
Usury, p. 327; *Palmer v. Baker*, 1 Maule & S. [Eng.], 56;
*Grubb v. Brooke*, 47 Pa. St., 485; *Large v. Passmore*, 5
S. & R. [Pa.], 51; *French v. Baron*, 2 Atk. [Eng.], 120;
*Brakely v. Tuttle*, 3 W. Va., 87.) The contract entered
into between Wanzer & Co. and J. C. Morrissey, and the
notes executed for the payment of moneys advanced under
said contract are gambling contracts, and are illegal and
void. (*Rudolph v. Winters*, 7 Neb., 126; *Pickering v. Cease*,
79 Ill., 328; *Embrey v. Jennison*, 131 U. S., 336; *Mohr v.*

*Meisen,* 49 N. W. Rep. [Minn.], 862; *Irwin v. Williar,* 110 U. S., 499; *Sprague v. Warren,* 26 Neb., 326; *Watte v. Wickersham,* 27 Id., 457; *Fareira v. Gabell,* 89 Pa. St., 89; *Lyon v. Culbertson,* 83 Ill., 33; *Roundtree v. Smith,* 108 U. S., 269; *Bigelow v. Benedict,* 70 N. Y., 202; *Hentz v. Jewell,* 20 Fed. Rep., 592; *Union Nat. Bank v. Carr,* 15 Id., 438; *Irwin v. Williar,* 4 Sup. Ct. Rep., 160; *Waugh v. Beck,* 6 Atl. Rep. [Pa.], 923; *Beadles v. McElrath,* 3 S. W. Rep. [Ky.], 152; *Cobb v. Prell,* 15 Fed. Rep., 774; *Barnard v. Backhaus,* 9 N. W. Rep. [Wis.], 595; *Fisher v. Bridges,* 3 El. & Bl. [Eng.], 641; *Griffith v. Sears,* 112 Pa. St., 523; *Flagg v. Baldwin,* 38 N. J. Eq., 218; *Loury v. Dillman,* 59 Wis., 197; *Melchert v. American Union Telegraph Co.,* 3 McCrary [U. S.], 521; Bishop, Contracts, sec. 535; *Oldershaw v. Knowles,* 101 Ill., 117; *Samuels v. Oliver,* 130 Id., 84; *Sampson v. Shaw,* 101 Mass., 145; *Raymond v. Leavitt,* 46 Mich., 447; 2 Parsons, Contracts, p. 747; *Nellis v. Clark,* 20 Wend. [N. Y.], 24; *Perkins v. Savage,* 15 Id., 412; *People v. Fisher,* 14 Id., 9; *Dixon v. Olmstead,* 9 Vt., 310; *Ball v. Gilbert,* 12 Met. [Mass.], 397; *Wheeler v. Russell,* 17 Mass., 258; *Hooker v. De Palos,* 28 O. St., 251; Greenhood, Public Policy, p. 642; *Wright v. Crabbs,* 78 Ind., 487; *Shaffnerr v. Pinchback,* 133 Ill., 410; *Cappell v. Hall,* 7 Wall. [U. S.], 558.)

*Lamb, Ricketts & Wilson, contra:*

It is discretionary with the trial court to call to its aid a jury on issues of fact in an equity cause. (*Wilson v. Riddle,* 8 Sup. Ct. Rep., 255; *Fishburne v. Furguson's Heirs,* 4 S. E. Rep. [Va.], 575; *De Witt v. Barly,* 17 N. Y., 350.) A defendant, in an equity case, who voluntarily pleads a counter-claim involving legal issues is not thereby entitled to a jury trial as a matter of right. (*Installment Building & Loan Co. v. Wentworth,* 25 Pac. Rep. [Wash.], 298; *Ryman v. Lynch,* 41 N. W. Rep. [Ia.], 320; *Gormley v. Clark,* 134 U. S., 338; *Martin v. Martin,* 24 Pac. Rep. [Kan.], 418;

52

*Wilson v. Johnson*, 43 N. W. Rep. [Wis.], 148; *Espenhain v. Steinkirchner*, Id., 158; *Dohle v. Omaha Foundry & Machine Co.*, 15 Neb., 437.) Right to jury trial on issue raised by counter-claim in equity suits is not guarantied by constitution. (*Chapman v. Robertson*, 6 Paige Ch. [N. Y.], 627; *Jennings v. Webster*, 8 Id., 503*; *MacKellar v. Rogers*, 17 N. E. Rep. [N. Y.], 350.) Where a court of equity once obtains jurisdiction it will retain it for the purpose of doing complete justice between the parties, although rights at law are involved. (1 Pom., Equity Jurisprudence, 181; *Ryman v. Lynch*, 41 N. W. Rep. [Ia.], 320; *Van Rensselaer v. Van Rensselaer*, 113 N. Y., 207; *Martin v. Martin*, 24 Pac. Rep. [Kan.], 418; *Haynes v. Whitsett*, 22 Id. [Ore.], 1072.) If any part of the case is exclusively of equitable cognizance a jury trial will be refused. (*Towns v. Smith*, 16 N. E. Rep. [Ind.], 812; *Quarl v. Abbott*, 1 Id., 482.) Demand for a jury trial not confined to law issues is properly denied. (*Lace v. Fixen*, 38 N. W. Rep. [Minn.], 762; *Greenleaf v. Egan*, 15 Id., 254.) When the right to terminate a contract on notice is reserved in the contract it will be enforced by the courts. (*Fitzgerald v. Allen*, 128 Mass., 232; *Ireland v. Dick*, 18 Atl. Rep. [Pa.], 735; *Crescent Mfg. Co. v. Nelson Mfg. Co.*, 13 S. W. Rep. [Mo.], 503; *Fitzpatrick v. Woodruff*, 96 N. Y., 561; *Balen v. Mercier*, 42 N. W. Rep. [Mich.], 667; *Henderson Bridge Co. v. O'Connor*, 11 S. W. Rep. [Ky.], 18; *Patrick v. Richmond & D. R. Co.*, 93 N. Car., 422; *Thayer v. Allison*, 109 Ill., 180.) A contract between a commission merchant and a grain buyer for a loan of money from the former with which to buy and store grain, which provides that the latter shall sell the grain for future delivery through the former, for which a commission is paid, will not make the contract usurious, although commissions and interest reserved exceed the highest lawful rate, unless it clearly appears that the contract was a cover for a usurious transaction. (*Matthews v. Coe*, 70 N. Y., 242; *Cockle v.*

*Flack*, 93 U. S., 344; *Virginia & T. R. Co. v. Campbell*, 22 Va., 438; *Hollis v. Swift*, 74 Ga., 595; *Callaway v. Butler*, 7 S. E. Rep. [Ga.], 224; *White v. Guilmartin*, 10 Id. 444; *Woolsey v. Jones*, 4 So. Rep. [Ala.], 190; *De Forest v. Strong*, 8 Conn., 513; *Beckwith v. Windsor Mfg. Co.*, 14 Id., 594.) When the promise to pay a sum above legal interest depends upon a contingency, the contract is not usurious. (*Spain v. Hamilton*, 1 Wall. [U. S.], 604; *Truby v. Mosgrove*, 11 Atl. Rep. [Pa.], 806; *Philadelphia & R. R. Co. v. Stichter*, 11 W. N. Cas. [Pa.], 325.) An agreement to sell grain for future delivery is not a gambling contract. (*Pixley v. Boynton*, 79 Ill., 351; *Sanborn v. Benedict*, 78 Id., 309; *White v. Barber*, 123 U. S., 392; *Sawyer v. Taggart*, 14 Bush [Ky.], 727; *Gregory v. Wendell*, 39 Mich., 337; *Whitesides v. Hunt*, 97 Ind., 191; *Irwin v. Williar*, 110 U. S., 499; *Bibb v. Allen*, 149 Id., 481.) This is true, though the seller has not the grain on hand but relies upon purchasing it in the open market to supply his sale. (*Bibb v. Allen*, 149 U. S., 481; *Gregory v. Wendell*, 39 Mich., 337; *Clarke v. Foss*, 7 Biss. [U. S.], 540; *Porter v. Viets*, 1 Id., 177.) A construction consistent with the validity of a contract is preferred. (*Wing v. Glick*, 56 Ia., 473; *Bigelow v. Benedict*, 70 N. Y., 202; *Story v. Solomon*, 71 Id., 420; *Clay v. Allen*, 63 Miss., 426; Wharton, Contracts, sec. 337.) The burden of proof is upon him who contends that a contract was intended as a cover for wagering transactions. (*Crawford v. Spencer*, 4 S. W. Rep. [Mo.], 713; *Dykers v. Townsend*, 24 N. Y., 57; *Mohr v. Miesen*, 49 N. W. Rep. [Minn.], 862; *Benson v. Morgan*, 26 Ill. App. Ct. 22.) The intention must be mutual and contemporaneous with the agreement to make a contract a cover for wagering transactions. (*Lehman v. Feld*, 37 Fed. Rep., 856; *Irwin v. Williar*, 110 U. S., 499; *Gregory v. Wendell*, 39 Mich., 337; *Beveridge v. Hewitt*, 8 Bradw. [Ill.], 467; *Clarke v. Foss*, 7 Biss. [U. S.], 540; *Bartlett v. Smith*, 13 Fed. Rep., 263; *Gregory v. Wendell*, 40

Mich., 432; *Murry v. Ocheltree*, 59 Ia., 435; *First Nat. Bank of Lyons v. Oskaloosa Packing Co.*, 23 N. W. Rep. [Ia.], 255; *Kent v. Miltenberger*, 13 Mo. App., 503; *Melchert v. American Union Telegraph Co.*, 11 Fed. Rep., 193; *Gilbert v. Gaugar*, 8 Biss. [U. S.], 214; *Fareira v. Gabell*, 89 Pa. St., 89; *State v. Carroll*, 6 Mo. App., 263; *Roundtree v. Smith*, 108 U. S., 269.) · · The deposit of margins to protect a sale or purchase against the fluctuations of the market is no evidence of a gambling transaction. (*Gruman v. Smith*, 81 N. Y., 25; *McGinnis v. Smythe*, 4 N. E. Rep. [N. Y.], 759; *Gregory v. Wendell*, 39 Mich., 337.) The sale on the board of trade of grain in store, although extended from month to month, and, in fact, never delivered, is not to be construed a gambling transaction. (*Douglas v. Smith*, 38 N. W. Rep. [Ia.], 163.) In a contract which is not as a whole illegal and is severable, that which is legal will be sustained, while that which is illegal will be rejected. (Wharton, Contracts, sec. 338; *Anderson v. Powell*, 44 Ia., 20.)

· RAGAN, C.

March 1, 1889, appellant was a grain dealer in Nebraska and appellees were commission merchants in Chicago, Illinois. These parties entered into a written contract bearing said date, in words and figures as follows:

. "This agreement, made this first day of March, 1889, by and between Wanzer & Co., of Chicago, Illinois, of the first part, and J. C. Morrissey, of Lincoln, Nebraska, of the second part, witnesseth as follows: Wanzer & Co. agree to loan to said 'Morrissey a sum not exceeding thirty thousand dollars, to be used in the purchase of corn and other grain, seeds, etc., in the state of Nebraska; the rate of interest on the same to be seven per cent per annum, to be charged monthly as said Morrissey's indebtedness 'may appear. Said Morrissey agrees to give his promissory notes at thirty, sixty, and ninety days, to be renewed from

time to time as may be necessary, for the entire sum so loaned, together with crib or warehouse receipts representing all the grain purchased with such funds, or other grain or produce of fully equal value. Said Morrissey further agrees to sell through said Wanzer & Co., for future delivery in the Chicago market, corn equal to the amount of ear corn purchased with funds furnished by Wanzer & Co., which sales may be changed from month to month as may be directed by said Morrissey. For the purchase and sale of this grain said Morrissey agrees to pay Wanzer & Co. one-sixteenth of one cent per bushel per month on all corn on hand at the close of each and every month, which shall cover the charge of changing from month to month; and, if purchases and sales of this character are made in any month in excess of the amount of corn on hand, the charge of such purchase and sale, or sale and purchase, shall also be one-sixteenth of one cent per bushel. Said Morrissey agrees to ship to Wanzer & Co. all grain, seeds, and other produce purchased by him, Wanzer & Co. to sell same in the Chicago market in such manner as in their judgment shall best serve the interests of said Morrissey, and the commission charge for such service shall be one-half cent per bushel for corn, and for all other grain or produce one-half the rates provided for by the rules of the Chicago board of trade for the shipment of non-members of said board of trade; provided, however, that said Morrissey shall have the privilege of selling such grain on track or of shipping it to other markets, having first obtained the written consent of said Wanzer & Co.; said Morrissey to pay to Wanzer & Co. the sum of $2 per car on every car of grain, or seed, or produce shipped by him or his agents during the life of this contract, and not handled by said Wanzer & Co., which $2 per car shall be in lieu of the one-half cent per bushel above provided for. Said Morrissey shall make a full statement at the close of each calendar month of the amount of grain on hand and the amount of grain

sold or shipped by him during that month other than to Wanzer & Co., and on receipt of said statement, Wanzer & Co. shall make the charges provided for in this agreement. Said Morrissey shall also furnish to said Wanzer & Co., on their request, a full and unreserved statement of his financial condition as they may demand from time to time.

"Beside such sums of moneys as are above provided for, Wanzer & Co. agree to pay drafts attached to negotiable bills of lading to nearly the value of the property so represented.

"Said Wanzer & Co. agree to report daily all sales of property for account of said Morrissey, and to furnish him with such information as he may request concerning such sales, and to make all returns as promptly as possible. Said Morrissey further agrees to pay interest on all sums Wanzer & Co. may deposit as margins on transactions made in his behalf, and said Wanzer & Co. shall notify said Morrissey of the deposit of said margins.

" This contract shall be terminated on the first day of March, 1890, Wanzer & Co. reserving the right to terminate the same by giving thirty days' written notice; and on the termination of this contract, either by such notice or at the expiration of the time herein agreed, said Wanzer & Co. shall be entitled to collect from said Morrissey a sum equal to one-half the charges said Wanzer & Co. would receive on the grain said Morrissey shall then have on hand, according to the afore-named rates in this contract.

"J. C. MORRISSEY.

"WANZER & Co."

Under this contract appellees advanced appellant $19,750, for which appellant gave his notes secured by warehouse or crib receipts on grain stored in his elevators in Nebraska. In January, 1890, appellees held a note of appellant for $2,000, dated March 15, 1889, due sixty days after date, on which there were due and unpaid $1,230 and some in-

terest; to secure the payment of which appellees held certain warehouse or crib receipts issued to them by the appellant on grain in his elevators. At this date, January, 1890, appellees sent this note and the crib receipts to a bank in Lincoln, Nebraska, for collection. It appears that while the bank held the note and warehouse receipts, appellant brought this action in the district court of Lancaster county to enjoin the appellees and the bank from transferring or disposing of the warehouse receipts and from taking possession of the grain covered by them, and to cancel said securities. Appellees filed a cross-petition in this action setting out the contract above, the giving to them by appellant of the note and crib receipts to secure the payment of the same, and that the note was unpaid, and prayed for an accounting of the amount due on it, and a foreclosure of their lien on the grain, and a sale of the same to satisfy the amount found due. Appellant then dismissed his injunction suit and filed an answer to appellees' cross-petition, which, after admitting the execution of the contract and note and crib receipts, set out the following defenses:

*a.* A general denial of the averments of the cross-petition.

*b.* That the crib receipts sought to be foreclosed had been satisfied by grain shipped and money remitted by the appellant to appellees according to the terms of said contract, and that the grain so shipped was grain purchased with the money borrowed by the appellant of the appellees, and the money remitted was proceeds derived from the sale of the grain purchased with the money borrowed of the appellees, and that appellant had no grain in his possession covered by said warehouse receipts.

*c.* That the appellant was financially responsible, and therefore appellees had a complete and adequate remedy at law, and that the court was without equitable jurisdiction.

*d.* That the contract between the parties and the notes executed in pursuance thereof were usurious.

*e.* That "the contract is illegal and void, having been made in violation of the law and against public policy, in so far as the plaintiff agrees to make good any margins advanced by the defendants on grain bought or sold for future delivery on the board of trade, * * * the same being a gambling contract."

*f.* A counter-claim that appellant was induced to sign the "contract with the belief and the understanding and agreement that the same should continue in force for one year from its date, and with the understanding and agreement then had, and with the understanding and agreement subsequently had, with the defendants that said contract should continue in force one year from its date; * * * and the plaintiff avers that notwithstanding said clause authorizing said forfeiture of said contract at the option of the defendants on thirty days' notice was in said contract at the date of its execution, yet it was then agreed and understood by and between the plaintiff and defendants that said clause should have no force and effect; * * * that the plaintiff continued to do business with the defendants until about the 18th of November, 1889, when the said defendants, arbitrarily, unjustly, and without any good cause or reason, notified the said plaintiff that said contract would be forfeited on or about the 20th day of December, 1889; * * * and by reason of the notice of said defendants that said contract was terminated, and their refusal to carry it into effect and advance said moneys for one year, as understood and agreed between the plaintiff and defendants, and by reason of the defendants' recall of all the moneys advanced and loaned, said plaintiff was damaged in his business and credit and put to great expense in the sum of $10,000."

The prayer of this answer was that the cross-petition of the appellees might be dismissed, and the appellant might have such other relief as in equity and good conscience the court might find him entitled.

To this answer appellees filed their reply denying all the allegations of new matter in the answer.

There was a trial to the court, who found all the issues in favor of the appellees, but found that appellant had sold and shipped the identical grain covered by the crib receipts, and the court rendered a personal judgment against the appellant for the amount due on the note.

When the issues were complete appellant moved the court to transfer the case to the law docket and impanel a jury for the trial of the case. This motion the court overruled. When the trial was about to begin appellant again moved the court for a jury trial on the issues of the facts involved in the case. This motion the court overruled. The overruling of these motions is the first complaint made by the appellant here. Whether this ruling of the court was correct depends upon the nature of the issues made by the pleadings and the character of the relief demanded.

The cross-petition alleged the making and delivery by the appellant to appellees of a note and certain warehouse receipts on grain in his elevators to secure the payment of the note; that the note was past due and unpaid. Appellees' prayer was for a foreclosure of the liens on the grain, and a decree for its sale to pay the amount due on the note.

The answer admitted the execution of the notes and securities, but alleged that the liens or crib receipts had been discharged; that the note was usurious; that the contract, out of which the subject-matter of the claim in the cross-petition grew, was void, being a gambling contract; that said contract as written was not as agreed and understood by the parties, and there was a prayer for a reformation of it.

The cross-petition demanded equitable relief only. It invoked the equity powers of the court, and the issues made by the cross-petition, the answer of the appellant thereto, and the reply of the appellees were entirely equitable; but appellant also alleged by way of counter-claim in his an-

swer that he had been damaged $10,000 by the wrougful termination of the contract by the appellees.

Did this counter-claim of the appellant for damages oust the court of its equitable jurisdiction? Is a defendant to a purely equitable suit entitled as a matter of right and law to a jury for the trial of an issue of law which he has voluntarily brought into the case? We think not. The appellant had a right, if he was so minded, to file his counter-claim for damages in this equity suit. It was an independent cause of action existing in his favor and against appellees, but appellant's cause of action on his counter-claim was not lost to him or barred had he left it out of this suit.

The action as made by the appellees in their cross-petition was one purely of equitable cognizance; but part of the relief demanded by the appellant could only be granted by a court of equity. The familiar principle is that when a court of equity acquires jurisdiction over a cause for any purpose, it may retain the cause for all purposes, and proceed to a final determination of all the matters put at issue in the case. (1 Pomeroy, Eq. Juris., sec. 181, and cases there cited.)

In *Wilson v. Johnson*, 74 Wis., 337, it is said: "An action to enforce a lien upon a pledge is an equitable one, triable by the court."

In *The Installment Building & Loan Co. v. Wentworth*, 25 Pac. Rep., 298, the supreme court of Washington say: "As the foreclosure of a mechanic's lien is a proceeding cognizable in a court of equity, the mere fact that the defendant in such suit interposes a counter-claim for damages, as he is allowed to do by the laws of Washington, is not sufficient to divest such court of its jurisdiction and to entitle defendant to demand a trial by jury."

This court said in *Dohle v. Omaha Foundry & Machine Co.*, 15 Neb., 436, that "An action to foreclose a mechanic's lien is essentially a suit in equity, and a party is not, as a

Morrissey v. Broomal.

matter of right, entitled to a jury trial therein." (See also, *Gormley v. Clark*, 134 U. S., 338; *Ryman v. Lynch*, 76 Ia., 587.)

After the evidence was in, it appeared that the grain called for by the warehouse receipts sought to be foreclosed had been already disposed of by the appellant, and his counsel now contends that the court should have then impaneled a jury. But this position is untenable. The court was sitting in equity. It had before it on the pleadings an equitable action, and it did not lose its jurisdiction because the evidence disclosed that the only adequate relief it could afford was a personal judgment. (*Van Rensselaer v. Van Rensselaer*, 113 N. Y., 207.) The court was right in refusing the appellant a jury trial.

The contract between the appellant and appellees contained this clause: "This contract shall be terminated on the first day of March, 1890, Wanzer & Co. reserving the right to terminate the same by giving thirty days' written notice; and on the termination of this contract, either by such notice or at the expiration of the time herein agreed, said Wanzer & Co. shall be entitled to collect from said Morrissey a sum equal to one-half the charges said Wanzer & Co. would receive on the grain said Morrissey shall then have on hand, according to the afore-named rates in this contract." On November 18, 1889, appellees notified appellant in writing of their election to terminate said contract on December 20, 1889, and on said last date appellees terminated the contract.

The appellant's next point is that the contract between him and the appellees was to continue in force until March 1, 1890, notwithstanding the agreement therein that the appellees might terminate it sooner. Appellant bases this contention on an agreement which he alleges existed between himself and appellees to that effect, outside of the instrument itself. The court found this issue against the appellant, and rightfully so. We cannot stop here to quote

the correspondence between the parties leading up to the
execution of this agreement, but it settles beyond all doubt
that the contract as signed and as it exists is in all respects
as all parties thereto understood it at the time of its exe-
cution.   The evidence shows that the appellees refused ab-
solutely to contract with appellant on any terms unless the
right to terminate the contract on thirty days' notice was
reserved to them in the instrument.   There was much cor-
respondence between the parties on this very clause, prior
to the execution of the contract; and it is a waste of words
in the face of this record to say that appellant did not
know that the right to terminate the agreement was re-
served, or that there was any agreement or understanding,
even on appellant's part, that the contract should, at all
events, run to March, 1890.   Appellant contends, however,
that notwithstanding the clause in the agreement reserved
to appellees the right to terminate it on giving thirty days'
notice, the contract could not, as a matter of law, be thus
terminated.   We do not so understand the law.   When
the right to terminate a contract on notice is reserved with-
out any fraud or mistake, but with the actual knowledge
and consent of all parties to the agreement, it is as valid
in law as any other clause of the instrument; and the
courts, when called upon, will enforce it, unless to do so
would be manifestly contrary to equity and good conscience.

In *Ireland v. Dick*, 18 Atl. Rep., 735, the supreme court
of Pennsylvania say: "The appellants, in May, 1876, ac-
cepted a license from appellees for the manufacture of
drilling jars and jar fillings under a certain patent.   The
agreement was in writing,—that is, it was a printed form,
filled in as to names, dated, etc., in writing, and with the
addition in writing, on the margin, of the following stipu-
lation: 'It is agreed by the parties of the first part that the
parties of the second part (licensees) can cancel this license
by giving thirty days' notice in writing.' *  *  *   This
portion of the instrument  *  *  * is presumed to have

been separately and particularly considered by the parties, and to express their exact agreement upon the subject. * * * Both parties acted under the license agreement until December 19, 1878, when the licensees under the written clause above quoted sent a notice to the licensors in the following terms: 'We wish to cancel our license concerning the manufacture of drilling jars, bearing date of May 16, 1876, as per contract.' * * * It is entirely clear that this letter was an absolute and complete rescission of the agreement."

The district court found that the appellant was not entitled to recover any damages from the appellees by reason of their having terminated the contract, and that finding is the next in order of appellant's complaints. This claim for damages is based solely on the assumption that the appellees violated their contract with the appellant. But did they? The contract was terminated in accordance with its provisions. There is no evidence tending to show that it was terminated by the appellees for a sinister purpose; nor that, in exercising their right to terminate it, they acted maliciously or arbitrarily. Indeed, the evidence would support a finding that the appellant's own violation of the contract afforded sufficient grounds for its termination by the appellees had the contract, by its terms, required the existence of such grounds as a prerequisite to the right of the appellees to terminate it. The evidence shows that the appellees, however, in no respect violated either the letter or spirit of the contract; nor has the appellant sustained any damages by reason of its termination, for which appellees can be made liable. The losses, if any suffered by the appellant in consequence of the termination of the agreement, were such only as he must have known, when he signed the contract, might ensue if it should be terminated according to its provisions.

The appellant also claims that the court's finding, that the contract between the parties thereto was not usurious,

.is erroneous. By the terms of the contract appellant was to pay seven per cent interest on all money loaned him by the appellees, the money borrowed to be used in the purchase of grain. Appellant was to pay appellees a commission of one-half of one cent per bushel for selling grain shipped to them, and $2 per car on diverted shipments; that is, for all grain he shipped to others than appellees, and which grain had been purchased with money furnished by them. Appellant was also to sell through the appellees, for future delivery in Chicago market, corn to equal the amount of ear corn purchased by the appellant with the money borrowed; and for making these sales appellant was to pay appellees one-sixteenth of one cent per bushel on all corn appellant had on hand at the close of each month. Appellant now contends that as the amount paid appellees on diverted shipments, $412, the amount paid for commission on sales for future delivery, $189.24, added to the amount paid as interest, $788.48, exceeded ten per cent interest on the money during the time it was loaned, that therefore the agreement was usurious. The contract is not on its face necessarily a usurious one. Appellees were engaged in the buying and selling of grain on commission, and had a right to lend their money at lawful rates of interest to such parties, and on such terms, as would probably increase their commission business, and out of which increase they might derive additional profit. The circumstance that their profits growing out of the transaction covered by the contract exeeded the legal rate of interest on the amount of money actually embarked in the enterprise does not afford conclusive proof that the agreement was in fact a usurious one. At the most this circumstance was evidence tending to show that the intention of the parties was to make the contract a cover for usurious transactions. The question is: Were these charges for diverted shipments and for making sales for future delivery honestly so intended by the parties as compensation for such services, or

were these charges invented as a cover for usury? This was a question of fact for a trial court to determine. He has found that the transactions were not usurious ones, and the evidence supports that finding. (*Cockle v. Flack*, 93 U. S., 344; *Beckwith v. Windsor Mfg. Co.*, 14 Conn., 594.)

Finally, it is said by the appellant that the contract between him and the appellees was a gambling contract, and void. If this is so, it must appear either from the instrument itself or from the transactions of the parties under it. The expressions in the contract which it is alleged show it a gambling contract on its face are as follows:

1. "Said Morrissey further agrees to sell through said Wanzer & Co., for future delivery in the Chicago market, corn equal to the amount of ear corn purchased with funds furnished by Wanzer & Co., which sales may be changed from month to month as may be directed by said Morrissey. For the purchase and sale of this grain said Morrissey agrees to pay Wanzer & Co. one-sixteenth of one cent per bushel per month on all corn on hand at the close of each and every month, which shall cover the charge of changing from month to month; and, if purchases and sales of this character are made in any month in excess of the amount of corn on hand, the charge of such purchase and sale, or sale and purchase, shall also be one-sixteenth of one cent per bushel.

2. "Said Morrissey further agrees to pay interest on all sums Wanzer & Co. may deposit as margins on transactions made in his behalf, and said Wanzer & Co. shall notify said Morrissey of the deposit of said margins."

The substance of the first quotation is that the appellant would sell through appellees in the Chicago market, for future delivery, as much corn as appellant purchased with the money borrowed of the appellees; in other words, it was an agreement to sell grain for future delivery. The sale of grain for delivery in the future is a valid contract. (*Gregory v. Wendell*, 39 Mich., 337.) "If a party has prop-

erty under his control, he has a right to sell it to be delivered at a future time." (*Sanborn v. Benedict*, 78 Ill., 309.) "A purchase of grain at a certain price per bushel, made in good faith, to be delivered in the future, is not an illegal or gambling contract." (*Pixley v. Boynton*, 79 Ill., 351; *Irwin v. Williar*, 110 U. S., 499.) "The validity of 'option' contracts depends upon the mutual intention of the parties. If it is not the intention in making the contract that any property shall be delivered or paid for, but that fictitious sales shall be settled on differences, the contract is illegal; but if it is the good faith intention of the seller to deliver, or the buyer to pay, and the option consists merely in the time of the delivery, within a given time, the contract is valid and the putting up of margins to cover losses which may accrue from fluctuations of the price is legitimate and proper." (*Union National Bank of Chicago v. Carr*, 15 Fed. Rep., 438, cited in *Whitesides v. Hunt*, 97 Ind., 191.) "A *bona fide* contract for the actual sale of grain, deliverable within a specified future month, * * * is not a gambling contract." (*White v. Barber*, 123 U. S., 392.) "Contracts for future delivery of personal property which the vendor does not own or possess, but expects to obtain by purchase or otherwise, are valid, if at the time of making the contract an actual transfer of the property is contemplated by at least one of the parties to the transaction." (*Bibb v. Allen*, 149 U. S., 481.) It seems settled from the foregoing authorities that this agreement to sell grain for future delivery is not, on its face, a gambling contract.

The substance of the second quotation is that the appellant agreed to pay interest on all sums of money appellees might advance for him as margins on transactions in his behalf. What transactions? Gambling transactions? We do not think such is a fair construction of the language of this instrument. Where a contract is capable of two constructions, the one making it valid and the other void,

the law will adopt the construction that upholds the contract.    (Wharton, Contracts, sec. 337.)    To say that this clause shows that the intention of the parties to the contract was to engage in gambling transactions in grain under it would be a forced construction of the language.    "A contract for the sale of grain for future delivery being legal, it logically follows that the agreement of the appellant to pay interest on moneys advanced for him by the appellees to protect these sales against the fluctuations of the market did not taint the contract with the vice of gambling." (*Gruman v. Smith*, 81 N. Y., 25; *Gregory v. Wendell*, 39 Mich., 337.)    In *Rudolf v. Winters*, 7 Neb., 125, this court said: "A contract to operate in grain options, to be adjusted according to differences in the market value thereof, is a contract for a gambling transaction, which the law will not tolerate."    We adhere to that decision.    (To the same effect, see *Embrey v. Jemison*, 131 U. S., 336; *Sprague v. Warren*, 26 Neb., 326; *Watte v. Wickersham*, 27 Id., 457.)    But the contract we are considering does not come within the rule laid down by those cases.    The true question here is from the terms of this contract, what was the intention of the parties thereto?    Was their intention to buy and sell grain upon the market, and settle the differences without any delivery?    If so, the contract was a gambling one, and void.    But to render a contract invalid it must appear, either from the instrument itself or from the evidence outside, that at the time of its execution the mutual intent of the parties was that no deliveries of grain should be made under it, but the difference in the price paid.    We are of the opinion that this contract, on its face, cannot be held a gambling one.    But appellant insists that if this agreement cannot be construed from its text to be a gambling contract, such facts nevertheless appear of evidence.    We cannot quote all the testimony to this point. The appellees testified that they had no intention by entering into this contract to speculate or gamble in the price of grain.

53

The appellant testified as follows:

Q. (By the court.)   What do you mean by "selling for future delivery"?

A. I will explain that to your honor.   We in the grain business build cribs and elevators for the purpose of getting storage out of our grain.   We buy the grain from the farmer in November and December and January, during the winter months, when there are good storage charges. The winter storage is generally about four cents from December until May.   *   *   *   Now, when a man takes and fills a crib up in November he has money to pay for it—he has money to pay for it in the bank, and he don't ship it out but puts it in the crib, and fills the cribs up; and as he fills the crib he wires a commission house in Chicago: "Sell 5,000 bushels March delivery against my actual corn in crib."

Q. Then he actually intends to deliver that corn?

A. Yes, sir.

Q. Is that a gambling contract?

A. That is not a gambling contract when you sell corn in crib for future delivery, when you have the actual corn.

Q. Was there anything of that kind in this contract between you and Wanzer & Co.?

A. I don't think there was any gambling any different from selling against the corn which was being held in cribs.

Q. Anything in the contract?

A. Not on my part, any other intention than that I went into this contract for to get the storage charges.   I had money enough to run this business.   The object was to put the corn in store, and get the winter storage on it;   *   *   * that was the inducement for going into that contract.

The record also shows that the appellant, from time to time, sold for future delivery as much grain as he had on hand, and when the time arrived to make delivery, instead of shipping the grain he had in the cribs, he would buy grain on the market to fill or offset the sales made, and re-

sell the grain on hand for a future delivery. These transactions, or rather the record of them, would make it falsely appear that the appellant sold very much more corn than he ever paid for during the time of the transactions; and it is this feature of the dealings of the parties that appellant's counsel claims establishes by the acts of the parties to the contract under it a gambling character. But we think this is not a fair deduction from the evidence. It shows that all these sales and purchases of appellant on the market were based on grain he had on hand, and that this selling and buying on the market was not dealing in options, not betting on the rise and fall of the market, but purchases made to fill sales he had previously made, and thus obviated the necessity of delivery of the grain he had in his cribs in Nebraska.

The case of *Douglas v. Smith*, 74 Ia., 468, is one in which the facts were substantially the same as in the case at bar, and that court said: "Where country grain buyers had a large quantity of corn in cribs, and they made sales from time to time through Chicago commission merchants for future delivery of No. 2 corn, but fearing that their corn would not grade No. 2, and hoping that it would improve with age, they bought in and resold, intending to deliver the corn to cover their sales, held, that the transactions were not illegal so as to defeat their brokers in the collections of margins advanced for them."

The facts in this case bring the transactions of the parties within the operation of the decisions of the case last above cited. The preponderance of the testimony establishes the fact that the sales made by the appellant were not wagers but that the grain was to be actually delivered at the time agreed upon. The decree of the district court is right and the same is in all things

AFFIRMED.

THE other commissioners concur.