JOHNSON LAKES DEVELOPMENT INCORPORATED, APPELLEE, V. CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DISTRICT, A POLITICAL SUBDIVISION AND PUBLIC CORPORATION OF NEBRASKA, APPELLANT.
R. DANIEL NIEMOTH AND LOIS M. NIEMOTH, APPELLEES AND CROSS-APPELLANTS, V. CENTRAL NEBRASKA PUBLIC POWER & IRRIGATION DISTRICT, A POLITICAL SUBDIVISION AND PUBLIC CORPORATION OF NEBRASKA, APPELLANT AND CROSS-APPELLEE.

576 N.W. 2d 806

Filed April 10, 1998.    Nos. S-95-1380, S-95-1388.

Michael C. Klein and Robert J. McCormick, of Anderson, Klein, Peterson, Swan & Bogle Louthan, for appellant.

Patrick W. Healey, of Healey & Wieland Law Firm, and E. Bruce Smith for appellees.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.
These cases involve the interpretation of a lease agreement between the Central Nebraska Public Power & Irrigation District (Central) and Johnson Lakes Development Incorporated (JLDI), which was incorporated in subleases between JLDI and various individuals who own cabins situated on the lakefront property owned by Central which is the subject of the

lease agreement. In an action commenced in the district court for Dawson County, JLDI obtained an injunction preventing Central from exercising a reserved power of termination contained in the lease agreement (JLDI action). A similar action filed by R. Daniel Niemoth and Lois M. Niemoth was dismissed as moot by virtue of the injunction entered in favor of JLDI (Niemoth action). On appeal, the Nebraska Court of Appeals consolidated the cases and reversed in part the district court's judgments, finding as a matter of law that the power of termination was unambiguous and valid. See *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 5 Neb. App. 957, 568 N.W.2d 573 (1997). Upon further review, we conclude that the judgment of the Court of Appeals with respect to each case was correct, and we therefore affirm the judgments of the Court of Appeals.

## FACTS

Central is a public corporation and political subdivision of the State of Nebraska. See Neb. Rev. Stat. § 70-601 et seq. (Reissue 1996 & Supp. 1997). On July 30, 1937, Central was granted a license by the Federal Power Commission, now known as the Federal Energy Regulatory Commission (FERC), to construct, operate, and maintain project No. 1417, which included dams, reservoirs, canals, power plants, transmission lines, and related improvements along the North Platte and Platte Rivers in several Nebraska counties. The license was issued for a period of 50 years.

On May 1, 1978, Central and JLDI entered into a written lease agreement pertaining to land owned by Central in conjunction with project No. 1417, which borders reservoirs commonly known as Johnson Lake and Plum Creek Lake (Johnson Lakes) in Gosper and Dawson Counties. The following provisions of the lease are pertinent to the issue before us:

> WHEREAS, the DISTRICT [Central] desires to provide a new Agreement for a thirty-one (31) year term with automatic renewal extension at the end of the first year and each successive year, resulting in a thirty-one (31) year maximum and a thirty (30) year minimum Agreement . . . [.]
>
> . . . .

NOW THEREFORE, in consideration of the mutual covenants, promises and agreements herein contained, the parties do hereby covenant, promise and agree as follows:

(1) The DISTRICT does hereby lease to JLDI for a period of thirty-one (31) years from this date the various properties or lands owned by the DISTRICT . . . .

(2) Said thirty-one (31) year period shall take effect on the date of this Agreement and shall include an automatic renewal period of one (1) year. This renewal period shall take effect at the end of the first year and at the end of each successive year in which the Agreement is in existence, resulting in a thirty-one (31) year maximum term and a thirty (30) year minimum term. Any and all leasing or sub-leasing done by JLDI under this Agreement shall not extend beyond the terms or period of this Agreement.

(3) Within one (1) year from the effective date of this Agreement, JLDI and all sub-lessees shall enter into new agreements based on the thirty/thirty-one (30/31) year period . . . .

(4) Within one-hundred-twenty (120) days from the effective date of this Agreement, JLDI shall furnish all sublessees with copies of this new Agreement between the DISTRICT and JLDI and copies of the revised lease between JLDI and its sublessees.

. . . .

(11) . . . Said subleases, leases or agreements shall also provide that the holders thereof shall be bound by all of the terms of this Agreement as herein written and that any violation of these terms and conditions of this Agreement shall be adequate and sufficient grounds for the termination or breach of said sublease, lease or agreement on the part of JLDI.

. . . .

(17) . . . All subleases or agreements made in the future by JLDI or any renewals of existing agreements concerning these [Johnson Lakes] properties shall be subject to all of the terms and provisions of this Agreement, as though this Agreement were fully set forth in the same.

. . . .

(31) It is understood and agreed by the parties to this Agreement that the powers of the DISTRICT are under limitation and restriction by reason of the Federal Energy Regulatory Commission (formerly Federal Power Commission) license dated July 30, 1937, and expiring fifty (50) years thereafter with the rights as thereon granted and agreed to, and in the event said FERC license is not renewed, that upon the expiration of such license this Agreement shall deliver full and complete possession of all leased areas to the DISTRICT by JLDI.

. . . .

(33) *The DISTRICT shall have complete power and authority to cancel or terminate this Agreement at any time it so desires by giving JLDI written notice of such intentions at least six (6) months in advance addressed to JLDI at its last known corporate address.* . . .

. . . .

(35) All prior existing agreements between the DISTRICT and JLDI shall be and whereby [sic] are terminated and this Agreement shall be the entire and only Agreement between these parties. *This Agreement cannot be changed, modified, abrogated or annulled, except that the same be in writing and signed by the parties hereto,* after the officers of the DISTRICT are authorized to do so by the Board of Directors of the DISTRICT.

(Emphasis supplied.) The lease agreement contained no provisions for rent.

JLDI subsequently entered into subleases with individuals, including the Niemoths, who own cabins situated on the lakefront property. The subleases contained the following pertinent provisions:

1. That JLDI has this day leased to TENANT, for cabin lot purposes only . . . on a 30 year minimum/31 year maximum, with an automatic annual renewal extension being made on the 1st day of May of each successive year, subject to all the terms and provisions of JLDI's lease agreement with The Central Nebraska Public Power & Irrigation District, hereinafter referred to as DISTRICT, dated the 1st day of May, 1978, all of the same being made

a part of this agreement; and subject to any amendments, changes and extensions of said agreement with the DISTRICT, and this lease agreement shall continue so long hereafter as JLDI's lease agreement with said DISTRICT shall remain in effect . . . .

. . . .

14. . . . [T]here are no other promises or covenants made by JLDI except as are contained in this Agreement, and/or as contained in the Agreement between DISTRICT and JLDI, which is attached hereto and made a part hereof.

15. TENANT hereby acknowledges receipt of a copy of this lease and a copy of the Lease Agreement dated May 1, 1978, between the DISTRICT and JLDI (excluding exhibits) and has read both agreements prior to signing this lease.

On June 28, 1984, Central filed an application with FERC for a new license for project No. 1417. Since that date, Central has continued to operate and maintain project No. 1417 under a series of annual licenses issued by FERC pending action on the application.

On March 4, 1994, Central's board of directors passed resolution No. 94-2, authorizing and instructing Central's president and secretary to enter into a modification agreement with JLDI and other lake associations "to provide, among other things, for the payment of fair and reasonable rent for the personal benefit received from the use of" the property owned by Central. The resolution gave JLDI until June 1, 1994, to enter into a modification agreement with Central. If JLDI failed to do so, Central's officers were authorized to begin the process of terminating the lease with JLDI. After negotiations between Central and JLDI failed to reach an agreement, JLDI and the Niemoths filed these actions in the district court for Dawson County.

## PROCEDURAL HISTORY

### DISTRICT COURT PROCEEDINGS IN JLDI ACTION

JLDI filed a petition on its own behalf as the lessee of Central and as representative of "the class and individual interest of sublessees with common interests who have built upon and improved lots upon JOHNSON LAKES." Although JLDI

alleged that it had leased properties bordering on Johnson Lakes for a period of approximately 50 years, the only written lease alleged was that of May 1, 1978, summarized above. JLDI alleged that it leased subdivided lots on this property to various individuals who, with the knowledge and approval of Central, made improvements on the lots, which improvements included structures, shoreline stabilization, and landscaping "in reliance on the status quo and representations made by CENTRAL." JLDI alleged that the adoption of resolution No. 94-2 by Central and its stated intention to terminate the lease if JLDI did not agree to a modification agreement providing for rents were unlawful, ultra vires, and unconstitutional. JLDI further alleged that Central was barred by equitable estoppel and laches from "disrupting, altering and changing the lot fees for the sublessees" of JLDI. JLDI also alleged that it had no adequate remedy at law and that it and its sublessees would be irreparably harmed unless Central were enjoined from taking unilateral action with respect to the lease. JLDI prayed for an injunction barring Central from enforcing resolution No. 94-2 or from taking any other action affecting JLDI or its sublessees without mutual consent; for declaratory judgment determining its rights and duties under the lease; and for other relief, including damages and attorney fees.

Before Central filed its answer, the district court granted Central's motion to strike the allegations in JLDI's petition dealing with improvements made by its sublessees in alleged reliance upon the actions and representations of Central. The court determined that JLDI, as a corporate entity, could not represent the interests of the individual sublessees. Central then filed an answer and cross-petition in which it admitted execution of the lease but denied JLDI's characterization of its terms. Central also admitted enactment of resolution No. 94-2 and submission of the proposed modification agreement to JLDI, but denied that "the management of Central did on or about March 10, 1994 assert an intention unilaterally to make material, substantial and unfavorable modifications [to the lease] contrary to the rights of JLDI and its sublessees." Central further alleged that it "has not fixed or established a rent for the use of Central's properties bordering said Johnson Lakes" and that the

modification agreement which it proposed was "offered to JLDI for purposes of negotiating a settlement and compromise." In its cross-petition, Central alleged that the lease had already terminated pursuant to paragraph 31 thereof because its FERC license expired on July 30, 1987, and had not been renewed, or, in the alternative, if the lease was still in effect, that Central had a right to cancel or terminate the lease pursuant to paragraph 33. Central prayed for a declaration of its rights under the lease agreement and other appropriate relief. JLDI filed a reply denying the interpretation of the lease alleged by Central in its cross-petition and alleging that Central "still purports to act as a licensed entity within the meaning of the agreements between the parties and is barred and estopped from claiming that it is not operating as a lawfully licensed entity."

JLDI and Central each filed motions for summary judgment. In an order entered November 28, 1995, the district court held that because Central had operated under a 1-year renewable license from the FERC pending renewal of its 50-year license, the lease agreement with JLDI had not terminated by operation of paragraph 31. The district court further held that paragraph 33 of the lease, setting forth Central's right to cancel, was ambiguous when read with paragraph 2, setting forth the term of the agreement, and paragraph 35, stating the agreement could not be annulled or abrogated except in writing signed by both parties. The district court concluded:

> In order to logically interpret the agreement, paragraph 33 must be read conditionally. That is the power and authority of [Central] to terminate the agreement must be based on a condition of termination relating to the operation or modification of the series of lakes and canals operated by [Central]. . . .
>
> To read paragraph 33 in any other way makes the agreement an illusory contract binding only [JLDI], and would result in a situation as has developed in the instant case. Here, [Central], in order to circumvent the requirement of paragraph 35 that any modification, such as for lot rents, be in writing and signed by both parties, attempts to terminate the agreement outright. The Court finds that [Central] is not so empowered under the agreement. The

Court finds that the ambiguity in the agreement must be resolved by determining paragraph 33 is one conditioned upon a showing by [Central] that the termination is directly related to the physical operation of the lake in its system of lakes and canals created to provide irrigation and hydroelectric services.

Based upon these findings, the district court granted JLDI's motion for summary judgment, overruled Central's motion for summary judgment, and entered a permanent injunction enjoining Central "from enforcing the provisions of Resolution 94-2 or proposed Modification Agreement, and from interfering with the rights, benefits and enjoyments of JOHNSON LAKES DEVELOPMENT INCORPORATED and its sublessees under the [lease agreement] and from unilaterally altering such agreement or providing for rents or application of rents." After its motion for new trial was overruled, Central perfected this appeal.

DISTRICT COURT PROCEEDINGS IN NIEMOTH ACTION

In their operative amended petition, the Niemoths alleged that they sublease an improved lot on Johnson Lakes from JLDI and that they and other sublessees are third-party beneficiaries of the May 1, 1978, lease agreement between JLDI and Central. The Niemoths alleged that they and other sublessees made improvements on their lots "in reliance on the status quo and representations made by CENTRAL" and that they would be irreparably harmed if Central were permitted to proceed with the plan of action described in resolution No. 94-2. The Niemoths alleged that such action would be unlawful, unconstitutional, and barred by equitable estoppel and laches. On behalf of themselves individually, and as representatives of a class consisting of "sublessees with common interests who have built upon and improved lots upon JOHNSON LAKES," the Niemoths prayed for declaratory and injunctive relief, damages, and attorney fees. Central filed an answer and cross-petition similar to that which it filed in the JLDI action. The Niemoths filed a reply similar to that filed in the JLDI action. Central and the Niemoths filed motions for summary judgment. In an order entered on November 28, 1995, the district court did not rule specifically on either motion, but dismissed the action, finding

that it was moot because of its order entered in the JLDI action. After its motion for new trial was overruled, Central perfected this appeal.

## DECISION OF NEBRASKA COURT OF APPEALS

Following consolidation of the two cases, the Court of Appeals issued a single dispositive opinion. See *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 5 Neb. App. 957, 568 N.W.2d 573 (1997). With respect to the JLDI action, the Court of Appeals held as a matter of law that (1) Central received a series of 1-year extensions following the alleged expiration of its original 50-year FERC license on July 30, 1987, and had operated the reservoir pursuant to those extensions; (2) by its actions since July 30, 1987, Central waived any right to claim that the lease terminated upon the expiration of the original license; and (3) the termination clause contained in paragraph 33 of the lease was unambiguous and gave Central a right to terminate the lease under the terms stated in that paragraph. The Court of Appeals did not decide the issues of equitable estoppel and laches arising from improvements on the property by JLDI or its sublessees, holding that these issues could not be resolved on a motion for summary judgment and that "such issues cannot arise until, at the earliest, Central in fact terminates the lease under paragraph 33." 5 Neb. App. at 972, 568 N.W.2d at 584. The Court of Appeals therefore reversed the findings of the district court with respect to paragraph 33 of the lease, ordered the injunction reversed and terminated, and remanded the cause to the district court with directions to enter partial summary judgment for Central recognizing its right to terminate the lease pursuant to paragraph 33 thereof. The Court of Appeals also determined that the rights of JLDI's sublessees are no greater than those of JLDI and that the Niemoth action should therefore be controlled by the results of the JLDI action. The Court of Appeals therefore reversed the finding of the district court that the Niemoths' action was moot. We granted the petitions of JLDI and the Niemoths for further review.

## ASSIGNMENTS OF ERROR

In its appeal of the JLDI action, Central contended that the district court erred in sustaining JLDI's motion for summary

judgment, in overruling Central's motion for summary judgment and motion for new trial, and in construing the terms and provisions of the lease agreement. In the Niemoth action, Central assigned as error the denial of its motion for summary judgment and the dismissal of its cross-petition as moot. The Niemoths cross-appealed, asserting that their case would not be moot if the summary judgment entered in favor of JLDI in the JLDI action were reversed on appeal and the cause remanded for further proceedings.

Restated, JLDI and the Niemoths allege in their petitions for further review that the Court of Appeals erred in (1) disregarding language in the lease which they characterize as creating "a rolling 30 year term," (2) misconstruing language in the lease which provided that it could not be "changed, modified, abrogated or annulled" without the consent of both parties, (3) disregarding the principle of construction requiring provisions of a contract to be read together so as to give meaning to all, and (4) determining that the trial court had stricken allegations concerning alleged improvements to Johnson Lake made by JLDI and its sublessees.

## STANDARD OF REVIEW

The dispositive issues in these appeals present questions of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. See, *Ray Tucker & Sons v. GTE Directories Sales Corp.*, 253 Neb. 458, 571 N.W.2d 64 (1997); *McDonald's Corp. v. Goler*, 251 Neb. 934, 560 N.W.2d 458 (1997); *Estate of Stine v. Chambanco, Inc.*, 251 Neb. 867, 560 N.W.2d 424 (1997).

## ANALYSIS

### JLDI Action

As a preliminary matter, we note that Central has not requested further review of the determinations made by the district court and the Court of Appeals that Central's lease with JLDI did not terminate by operation of paragraph 31 thereof because of its continued operation of project No. 1417 pursuant to renewable 1-year licenses issued by the FERC. We determine

that this issue was correctly decided by the district court for the reasons articulated by the Court of Appeals. See *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 5 Neb. App. 957, 568 N.W.2d 573 (1997).

The principal issue before us is whether paragraph 33 of the lease gives Central a right to cancel or terminate by giving JLDI written notice of such intent at least 6 months in advance. A lease agreement is to be construed as any other contract. *Bedrosky v. Hiner*, 230 Neb. 200, 430 N.W.2d 535 (1988). In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Daehnke v. Nebraska Dept. of Soc. Servs.*, 251 Neb. 298, 557 N.W.2d 17 (1996); *C.S.B. Co. v. Isham*, 249 Neb. 66, 541 N.W.2d 392 (1996). A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Daehnke v. Nebraska Dept. of Soc. Servs., supra; Winfield v. CIGNA Cos.*, 248 Neb. 24, 532 N.W.2d 284 (1995). The determination of whether a contract is ambiguous is to be made on an objective basis, not by the subjective contentions of the parties suggesting opposing meanings of the disputed language. *Daehnke v. Nebraska Dept. of Soc. Servs., supra; Murphy v. City of Lincoln*, 245 Neb. 707, 515 N.W.2d 413 (1994). The terms of a contract are to be accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Daehnke v. Nebraska Dept. of Soc. Servs., supra; Murphy v. City of Lincoln, supra*.

We find no ambiguity in the language of paragraph 33, which provides that Central "shall have complete power and authority to cancel or terminate this Agreement at any time it so desires by giving JLDI written notice of such intentions at least six (6) months in advance addressed to JLDI at its last known corporate address." Giving the language its plain and ordinary meaning, this provision unequivocally gives Central the right to end its contractual relationship with JLDI upon giving the requisite notice in the manner prescribed. However, this finding is not determinative, since we are required to construe a contract as a whole, and if possible, to give effect to every part of the contract. See, *C.S.B. Co. v. Isham, supra; Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993).

JLDI contends that paragraph 33 of the lease agreement is ambiguous when read in conjunction with that portion of paragraph 35 which provides that the lease agreement "cannot be changed, modified, abrogated or annulled" except by written agreement of the parties. JLDI argues that

> [r]ead together, paragraphs 33 and 35 provide that Central may, throught [sic] its directors, propose cancellation or termination of the agreement but that for any change, modification, abrogation or annulment of the contract to take effect, such change, modification, abrogation or annulment has to be in writing and signed by both parties.

Memorandum brief for appellees in support of petition for further review at 6-7. We reject this argument for two reasons. First, it would require that we simply ignore the language of paragraph 33, which gives Central *complete power and authority* to terminate or cancel the lease agreement, and focus instead on paragraph 35, which requires written consent of the parties in order to change, modify, abrogate, or annul the agreement. We have written that a party "may not pick and choose among the clauses of a contract, accepting only those that advantage it." *Daehnke v. Nebraska Dept. of Soc. Servs.*, 251 Neb. at 303, 557 N.W.2d at 21. Accord *Bedrosky v. Hiner, supra.* Second, we agree with the Court of Appeals that "a proviso that the lease may not be 'changed, modified, abrogated or annulled' " without mutual consent of the parties does not conflict with a clause under which the lessor reserves the right to " 'cancel or terminate' " a lease by giving advance written notice to the lessee. *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 5 Neb. App. 957, 970, 568 N.W.2d 573, 582 (1997). When used in reference to a contract, the terms "abrogate," "annul," and "cancel" mean to rescind the contract and thereby nullify its existence. See, *Hoeft v. Five Points Bank*, 248 Neb. 772, 539 N.W.2d 637 (1995); *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993). In contrast, the

> "reservation of such a power to terminate does not invalidate the contract or render the consideration for a promise insufficient, so long as the party reserving the power to terminate is irrevocably bound for any appreciable period of time or has materially changed any of his legal relations

or otherwise rendered some performance capable of operating as a consideration. If a period of notice is required, the contract remains in force and must continue to be performed according to its terms during the specified period after receipt of the notice of termination. . . ." *Johnson Lakes Dev. v. Central Neb. Pub. Power*, 5 Neb. App. at 970-71, 568 N.W.2d at 583 (quoting 6 Arthur L. Corbin, Corbin on Contracts § 1266 at 66 (1962)). Thus, if a contract lawfully grants a party the right to unilaterally terminate the contractual relationship after partial performance, the exercise of that right in the manner specified is not a change, modification, abrogation, or annulment of the contract, but, rather, an action contemplated by and taken pursuant to the original agreement of the parties as embodied in their contract. We agree with the Court of Appeals that the dispositive issue is whether the termination provision contained in paragraph 33 of the lease agreement is valid.

As a general rule, the owner of property is entitled to terminate a lease of that property so long as the termination is accomplished in accordance with the law and in a timely fashion. See *Moudry v. Parkos*, 217 Neb. 521, 349 N.W.2d 387 (1984). However, JLDI argues that the unilateral termination clause contained in paragraph 33 of the lease agreement is invalid because it conflicts with the term of the lease as set forth in paragraphs 1 and 2. JLDI contends that these provisions create "a 'rolling' term of at least 30 years beyond the year's term in effect at any moment in time." Memorandum brief for appellees in support of petition for further review at 7. Central acknowledges that paragraphs 1 and 2 "provide that the term of the lease agreement automatically renews for an additional year at the end of each year in which the lease agreement is in existence." Additional brief for appellant on appellee's petition for further review at 10. For purposes of analyzing the validity of the termination clause, we regard the lease as creating a tenancy for a term of years. The legal issue which we must resolve is whether parties may legally contract for a leasehold of at least 30 years' duration, with the lessor reserving a unilateral right to terminate the lease for any reason upon the giving of 6 months' written notice.

Two of our cases provide some guidance. In *Morrissey v. Broomal*, 37 Neb. 766, 56 N.W. 383 (1893), a party to a commercial contract with a stated term of 1 year contended that the other party could not terminate the contract prior to the end of the year, notwithstanding a clause in the contract which reserved the right to terminate upon giving 30 days' notice. We rejected this argument, holding that

> [w]hen the right to terminate a contract on notice is reserved without any fraud or mistake, but with the actual knowledge and consent of all parties to the agreement, it is as valid in law as any other clause of the instrument; and the courts, when called upon, will enforce it, unless to do so would be manifestly contrary to equity and good conscience.

37 Neb. at 780, 56 N.W. at 386.

We considered the validity of a reserved power of termination in a lease for a term of years in *Frankel v. Pitlor*, 166 Neb. 219, 88 N.W.2d 770 (1958). There the plaintiff, a real estate agent, claimed a commission based upon a listing agreement in which the sellers specified that the buyer must agree to lease the property back to them for a period of 1 year from the date of closing. The purchase agreement which the agent obtained contained the buyer's agreement to a 1-year lease back to the sellers, but also incorporated a printed lease form pursuant to which the buyer/lessor could terminate the lease at the end of any calendar month on 6 months' notice. In determining that this did not constitute an unconditional acceptance of the offer to sell, we rejected the agent's contention that the typewritten terms of the purchase agreement controlled over the printed lease form attached to the agreement. Noting that this principle of construction applied only where ambiguity or inconsistency existed between the typewritten and printed documents, we held that the 1-year lease term and the reserved right of the lessor to terminate prior to the expiration of that term were "neither ambiguous nor inconsistent." *Id.* at 222, 88 N.W.2d at 773. We cited with approval the decision of the Iowa Supreme Court in *Pearson v. Howell*, 184 Iowa 990, 169 N.W. 368 (1918), holding that unaided by extrinsic evidence, a court would be required to construe similar provisions as a fixed term subject to

defeat by exercise of the lessor's reserved power of termination. Finding that the listing agreement clearly included as a condition of sale a lease back to the sellers for a period of 1 year, we concluded:

> Since the purchase agreement [obtained by the agent] provided for a lease that could be terminated at the end of any calendar month after 6 months' notice, [the sellers] could properly assert that the purchase agreement was not an unconditional acceptance of [their] offer to sell, as set forth in the listing agreement. If [the sellers] had signed the purchase agreement tendered to them, the termination provision in the lease could have been enforced against them.

166 Neb. at 223, 88 N.W.2d at 773.

Other courts have recognized the right of parties to a lease for a term of years to reserve the power to terminate the lease prior to the expiration of the stated term. See, e.g., *Pedigo's Groceries, Inc. v. Mr. M Corp.*, 633 S.W.2d 353 (Tex. App. 1982) (upholding reserved right of either party to terminate 180-month commercial lease by giving 30 days' written notice); *Amoco Oil Co. v. Burns*, 496 Pa. 336, 437 A.2d 381 (1981) (upholding reserved right of lessor to cancel commercial lease after automatic renewal of term by giving 60 days' written notice); *Preston A. Higgins & Co. v. Stevenson*, 28 Ill. App. 3d 150, 328 N.E.2d 79 (1975) (upholding reserved right of parties to commercial lease to terminate before expiration of term by giving 30 days' written notice). While each of these cases involved lease provisions permitting either party to terminate, we do not regard the reserved power to terminate in the instant case as invalid simply because it is unilateral. As observed in Williston on Contracts:

> The confusion attendant upon the use of the term mutuality has arisen most frequently when one party under a contract has an option, not given to the other, of discontinuing or extending performance or of cancelling or renewing the contract, or in some manner of determining the extent of performance. If the power conferred goes so far as to render illusory the promise of the party having the option, there is indeed no consideration, and therefore no contract.

> However, the mere fact that the option prevents the mutual promises from being coextensive with one another does not prevent both promises from being binding according to their respective terms.

3 Richard A. Lord, Williston on Contracts § 7:14 at 297-300 (4th ed. 1992).

Similarly, it is stated in Corbin on Contracts:

> The power to terminate that is reserved is invariably a power to terminate the whole contract, including both promises alike. Where one promise is illusory and the other is not, it looks as if the one promised performance must be rendered whether the other is performed or not. This is not so in the case of a power to terminate. If the power is exercised, both parties are freed from their promissory duties. If it is not exercised, neither one is freed. It does not appear to involve an attempt to get something for nothing, and there is no such result whether the power is exercised or not.
>
> This being so, the contract should not be regarded as unfair for its supposed lack of "mutuality."

2 Joseph M. Perillo and Helen H. Bender, Corbin on Contracts, § 6.10 at 293 (rev. ed. 1995).

We cannot agree with the finding of the district court that enforcement of paragraph 33 of the lease agreement according to its terms would render the lease "an illusory contract binding only [JLDI]." It is true that an agreement which depends upon the wish, will, or pleasure of one of the parties is illusory and does not constitute an enforceable promise. See, *Pantano v. McGowan*, 247 Neb. 894, 530 N.W.2d 912 (1995); *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987). Generally, mutuality of obligation is an essential element of every enforceable contract and consists in the obligation on each party to do, or permit something to be done, in consideration of the act or promise of the other. Mutuality is absent when only one of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only. *De Los Santos v. Great Western Sugar Co.*, 217 Neb. 282, 348 N.W.2d 842 (1984). However, courts which have examined the enforceability of unilateral powers to terminate contracts have

held that such powers do not render a contract illusory so long as the party reserving the power to terminate is irrevocably bound for any appreciable period of time or has materially changed any of his legal relations or otherwise rendered some performance capable of operating as consideration. See, e.g., *Niagara Mohawk Power v. Graver Tank & Mfg.*, 470 F. Supp. 1308 (N.D.N.Y. 1979) (applying New York law); *Acme Markets v. Dawson Enterprises*, 253 Md. 76, 251 A.2d 839 (1969); *David Roth's Sons, Inc. v. Wright and Taylor, Inc.*, 343 S.W.2d 389 (Ky. 1961). See, also, 6 Arthur L. Corbin, Corbin on Contracts § 1266 (1962). Even a slight restriction on the exercise of the right of termination, such as the requirement that advance notice be given, is sufficient to prevent a unilateral right of termination from being regarded as illusory in nature. *Niagara Mohawk Power v. Graver Tank & Mfg., supra; David Roth's Sons, Inc. v. Wright and Taylor, Inc., supra.* Here, the requirement that Central give JLDI 6 months' advance written notice of its intent to terminate the lease, and the fact that the lease would remain in effect during that 6-month period, was sufficient to establish the requisite mutuality.

We therefore agree with the Court of Appeals that paragraph 33 of the lease agreement constitutes an unambiguous and valid reserved right of termination and, therefore, that Central is entitled to partial summary judgment. We also agree that the record before us is insufficient to determine as a matter of law whether or not Central is equitably estopped or barred by the doctrine of laches from exercising this power, and we therefore do not address these issues.

## NIEMOTH ACTION

The sublease between JLDI and the Niemoths expressly incorporated the provisions of the lease agreement between JLDI and Central. Thus, Central is entitled to partial summary judgment on its cross-petition declaring its contractual right to terminate the lease agreement upon giving the requisite notice. Whether it is equitably estopped or barred from exercising that right remains to be determined; the Niemoths' action is therefore not moot and should not have been dismissed.

## CONCLUSION

For the reasons discussed above, we conclude that the Court of Appeals correctly decided the issues before it and that its judgment in the JLDI action affirming in part, and in part reversing with directions should be affirmed. Likewise, its judgment in the Niemoth action reversing with directions should be affirmed. We therefore affirm the Court of Appeals' judgments, and both causes are remanded to the district court for Dawson County for entry of judgment in accordance herewith.

AFFIRMED.