# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1399

_____

| | | |
|---|---|---|
| Garland C. Cook, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Nebraska Public Power District; | * | |
| Westinghouse Electric Corporation, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

No. 98-1544

_____

| | | |
|---|---|---|
| Garland C. Cook, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| Nebraska Public Power District, | * | |
| | * | |
| Defendant - Appellant, | * | |
| | * | |
| Westinghouse Electric Corporation, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: January 13, 1999
Filed:   March 25, 1999
_____

Before BOWMAN, Chief Judge, WOLLMAN, and MURPHY, Circuit Judges.
_____

BOWMAN, Chief Judge.

Garland C. Cook, a millwright employed by Westinghouse Electric Corporation (Westinghouse), was injured while working at a nuclear power plant owned and operated by Nebraska Public Power District (NPPD). Cook received workers' compensation from Westinghouse, then sued NPPD, alleging its negligence had contributed to his injuries. NPPD filed a cross-claim against Westinghouse, seeking contractual indemnification for defending against Cook's lawsuit. The District Court conducted a bench trial, then entered judgment in favor of NPPD on Cook's negligence claim and in favor of Westinghouse on NPPD's indemnification cross-claim. Both Cook and NPPD appeal. We affirm in part, reverse in part, and remand the case with instructions.

I.

NPPD is a public corporation and political subdivision of the State of Nebraska. In October 1984, it signed a general services agreement with Westinghouse that established the terms under which Westinghouse would perform services for NPPD. The two parties supplemented this agreement several times with specific work agreements, including a February 1993 supplemental agreement in which Westinghouse agreed to perform general maintenance and repair work at NPPD's Cooper Nuclear Station (CNS) during a scheduled spring 1993 maintenance outage.

-2-

As part of the spring 1993 outage agreement, Westinghouse agreed its millwrights would inspect the large turbine-generator rotor shaft at CNS for erosion or damage. The rotor shaft, which is more than 100 feet long, consists of a series of large metal cylindrical sections connected by flanged couplings. The sections lie lengthwise, with the bottom third of each section recessed below a metal platform called the turbine deck.

In order to inspect the unexposed portion of the rotor shaft, the Westinghouse millwrights have to turn the shaft. To do this, several millwrights standing on the turbine deck remove the bolts from the exposed portion of a flanged coupling. After the bolts are removed, the millwrights insert a steel turning pin approximately twelve inches long into an empty bolt hole. Around the turning pin the millwrights loop a steel cable called a choker, which is connected to the hook of an overhead crane. With hand signals the millwrights then direct the overhead crane operator, an NPPD employee seated inside the crane approximately thirty feet above the turbine deck, to operate the crane and raise the choker in short intervals. These short lifts, called "bumps," exert upward pressure on the turning pin, causing the rotor shaft to turn. Once the rotor shaft has been turned a few inches, the millwrights release the choker from the turning pin and remove another bolt or bolts if possible. The millwrights then transfer the turning pin to another empty bolt hole on the flanged coupling and repeat the process until all the bolts are removed. When the bolts are removed and the shaft sections uncoupled, the millwrights inspect each section, perform appropriate maintenance, then realign and recouple the shaft sections using essentially the same process.

At approximately 12:30 a.m. on March 13, 1993, several Westinghouse millwrights prepared to turn a section of the rotor shaft. The shaft sections had been uncoupled, and the millwrights intended to turn the section until it was properly aligned and then recouple it to an adjacent section. Cook stood about seven feet away, preparing to assist with the realignment.

The millwrights inserted a turning pin into one side of the flanged coupling. The turning pin, however, was smaller than the bolt hole into which the millwrights inserted it: the turning pin was approximately 2.00 inches in diameter, while the bolt hole was 2.22 inches in diameter. (Couplings along the rotor shaft had bolt holes of varying sizes, and several sizes of turning pins were available.) The 0.22 inch difference allowed the turning pin to shift in the bolt hole enough that the free end of the turning pin angled upward four degrees when pressure was applied.

The millwrights then looped a choker around the turning pin's free end, which protruded out of the coupling approximately seven inches. The choker was more than twenty feet long and an inch-and-a-half in diameter. At each end of the choker was a loop of cable called an "eye." The District Court concluded, and it is not disputed in this appeal, that at the time of the accident both eyes were attached to the overhead crane's hook, and the resulting "basket" of cable was looped around the turning pin's free end. See Cook v. Nebraska Pub. Power Dist., No. 8:94CV659, at 6 (D. Neb. Dec. 30, 1997) (Memorandum and Order). The District Court also found that the choker was bent, and that the bend caused the choker to hang off-center when permitted to dangle free. See id. at 6, 11.

After the millwrights looped the choker around the turning pin, they signaled for the NPPD crane operator to bump the turning pin. He did so, but the rotor shaft did not turn. Therefore, the millwrights signaled the crane operator to bump the turning pin again. They repeated this process until, after the third or fourth bump, the upward pressure from the crane had caused the turning pin to bend seven degrees. This bend in the turning pin, combined with the shifting of the undersized turning pin inside the larger bolt hole, allowed the choker to slide off the turning pin. It did so and struck Cook in the head, causing him serious injuries.

Cook received workers' compensation benefits from Westinghouse, then filed a diversity suit in federal court seeking damages from NPPD for its alleged

negligence. Cook named Westinghouse a defendant to preserve its subrogation interest in any recovery Cook might obtain. NPPD then filed a cross-claim against Westinghouse, seeking indemnification based upon a provision in the 1984 general services agreement.

The District Court heard four days of testimony and received hundreds of exhibits before entering judgment in the case. Then, applying Nebraska law, the District Court found that Cook did not prove NPPD should be liable for his injuries. Cook had claimed that NPPD should have direct liability because its employee operated the crane negligently by using a bent choker, and that this negligence contributed to Cook's injuries. The District Court, however, determined that the bent choker was not a cause of Cook's injuries. The court concluded that the undersized turning pin was the cause of Cook's injuries and that "Westinghouse employees selected the undersized turning pin, positioned the undersized turning pin in the flange hole, and directed the crane operator to apply upward tension." Memorandum and Order at 12. Finding that NPPD had no duty to protect Cook from Westinghouse's negligence, the District Court also rejected Cook's assertion that NPPD should have vicarious liability. See id. at 13-18.

The District Court then determined that Westinghouse did not have to indemnify NPPD for losses incurred defending against Cook's suit. According to the District Court, Cook filed suit "not by reason of Westinghouse's negligence, but, rather, because of alleged negligence of NPPD." Id. at 21. Therefore, according to the District Court, the lawsuit was not covered by the indemnification provision in the Westinghouse-NPPD 1984 general services agreement. The District Court entered judgment in favor of NPPD on Cook's negligence claim and in favor of Westinghouse on NPPD's indemnification cross-claim. Both Cook and NPPD appeal.

II.

Cook argues that the District Court erred because it "had no factual basis on which to exclude the choker" as a cause for his injuries. See Cook's Br. at 1. Because Cook challenges the District Court's findings of fact, we review for clear error. See Fed. R. Civ. P. 52(a); Moore v. Novak, 146 F.3d 531, 534 (8th Cir. 1998).

> Under this standard, we will overturn a finding of fact only if it is not supported by substantial evidence in the record, if the finding is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error has been made. A district court's choice between two permissible views of evidence cannot be clearly erroneous.

Estate of Davis v. Delo, 115 F.3d 1388, 1393-94 (8th Cir. 1997) (citation omitted).

To determine whether the bent choker was necessarily a cause of Cook's injuries, we describe the competing theories the parties advance to explain how the crane was able to bend the turning pin. Both parties agree that, because of the amount of force applied by the crane and the yielding point of the turning pin, the choker had to be located about two inches from the turning pin's free end when the crane applied pressure for the turning pin to yield and bend. But the parties dispute how the choker came to be positioned only two inches from the turning pin's free end. The millwright who placed the choker on the turning pin testified that he put the choker directly against the flange. Relying on this testimony, Cook argues that the bend in the choker drew the choker outward, so that the choker hopped approximately five inches toward the turning pin's free end with the initial bumps and reached the point two inches from the turning pin's free end with the penultimate bump. The final bump then caused the turning pin to yield and bend, and the choker slid off. NPPD, in response, argues that the millwright placed the choker not against the flange but two inches from the turning pin's free end. Therefore, each bump from the crane bent the

turning pin upward until, when the turning pin was bent seven degrees, the choker was able to slide off and strike Cook in the head.

The District Court did not expressly adopt either Cook's or NPPD's theory of how the choker came to be located only two inches from the turning pin's free end. But the District Court did determine that the bend in the choker was not a cause of Cook's injuries because, when the crane applied upward pressure to the choker, this pressure "resulted in the temporary removal of the outward bend in the choker." Memorandum and Order at 7. This conclusion is supported by the record. See, e.g., Trial Tr. at 85-86 (testimony of Lawrence Nice) (testifying that most chokers do not hang straight after the first use, but they straighten out when pressure is applied).

The record also contains additional evidence upon which the District Court could have relied to reject Cook's theory that the bend in the choker was a cause for choker to slide off the turning pin. NPPD offered evidence that the choker could not and did not hop across the turning pin. The crane operator testified that the crane maintained pressure on the turning pin between bumps. See Trial Tr. at 418, 429 (testimony of Timothy Pugh). Therefore, there would have been no slack that would have allowed the choker to hop across the turning pin as Cook claimed it did. Instead, if Cook were correct that the millwright placed the choker against the flange, the choker could only have slid across the turning pin until it reached the point where the upward pressure exerted by the crane sufficed to bend the turning pin. NPPD also offered evidence to prove that the choker did not slide across the turning pin. For example, NPPD's expert testified, and Cook's expert conceded on cross-examination, that there were scratch marks on the final two inches of the turning pin (where both sides agreed the choker slid across the pin), but not on the turning pin between the flange and the point where the choker bent the turning pin. See id. at 634, 638 (testimony of Dean Orr); id. at 189-90 (testimony of Dr. Alexander Peters). The scratch marks suggest that the choker slid across only the final two inches of the

turning pin, not the full distance (about seven inches) from the flange to the turning pin's free end.

Finally, NPPD challenged Cook's theory that, after moving across the turning pin toward its free end, the choker would have bent the turning pin before sliding off. The turning pin had no obstruction or shoulder to stop the choker two inches from the turning pin's free end. Therefore, if the bend in the choker had caused the choker to move outward along the turning pin, the choker probably would have slid off the turning pin, without bending it, during the final bump. See id. at 640, 667 (testimony of Dean Orr).

The District Court's conclusions are supported by the record, and evidence in the record provides a sufficient basis for the District Court to conclude that the bend in the choker was not a cause for Cook's injuries. Therefore, we cannot say the District Court clearly erred when it found that no negligence by NPPD contributed to Cook's injuries.

III.

Cook also argues the District Court erred when it concluded that NPPD had no legal duty to protect him from Westinghouse's negligence. We review the District Court's determinations of Nebraska law de novo, see Salve Regina College v. Russell, 499 U.S. 225, 231 (1991), and its factual findings for clear error.

The District Court determined that Westinghouse was an independent contractor employed by NPPD, and Cook does not challenge that determination. Under Nebraska law,

> The general rule is that the employer of an independent contractor is not
> liable for physical harm caused to another by the acts or omissions of the

contractor or his servant. However, an employer of an independent contractor may be liable (1) if the employer retains control over the contractor's work or (2) if under the rule of law or statute, the employer has a nondelegable duty to protect another from harm caused by the contractor.

Whalen v. US West Communications, Inc., 570 N.W.2d 531, 538 (Neb. 1997) (citation omitted). Cook argues that NPPD should be liable for the harm caused by Westinghouse's millwrights because NPPD retained control over Westinghouse's work at CNS and because NPPD had a nondelegable duty to protect Cook from the special risks or dangers involved in turning the turbine-generator rotor shaft.

We first consider whether the District Court erred when it found that NPPD did not retain control over Westinghouse's work. In order to prove that NPPD retained control over Westinghouse's work during the spring 1993 outage, Cook needed to show that NPPD "(1) supervised the work that caused the injury; (2) had actual or constructive knowledge of the danger which ultimately caused the injury; and (3) had the opportunity to prevent the injury, but negligently failed to prevent the injury." Kime v. Hobbs, 562 N.W.2d 705, 712 (Neb. 1997). According to the District Court, the record revealed "that NPPD neither supervised the work, nor had actual or constructive knowledge of the danger, that ultimately caused Cook's injury." Memorandum and Order at 15.

The record indicates that the Westinghouse millwrights were not under NPPD supervision while turning the rotor shaft. The Westinghouse millwrights involved in turning the rotor shaft testified that they received orders from a Westinghouse supervisor, who testified he received his assignments from Westinghouse employees. No NPPD employee told the Westinghouse millwrights when or how they should turn the rotor shaft. In fact, the only NPPD employee near the accident was the crane operator, who was located thirty feet above the millwrights and communicated with the millwrights only by observing their hand signals.

Under Nebraska law, the mere presence and minor participation of an NPPD employee does not suffice to show that NPPD retained control over the millwrights. See Whalen, 570 N.W.2d at 539-40 (finding a property owner did not retain control over an independent contractor's work, despite the fact that the owner's employee had delivered equipment to the property and was present when the plaintiff was injured unloading that equipment). NPPD did retain some authority over Westinghouse and its employees, including contractual rights to inspect Westinghouse's work, drawings, and documents; to exercise some control over Westinghouse's choice of personnel; and to suspend or terminate Westinghouse's performance. See Agreement No. 84A-MS3 between Westinghouse and NPPD, General Services, art. VI & VIII. But such a limited retention of authority does not suffice to render NPPD liable under Nebraska law. See Whalen, 570 N.W.2d at 538 (finding a property owner did not retain control, although the contract allowed the owner to inspect the independent contractor's work and to stop the work under certain circumstances); Kime, 562 N.W.2d at 712 (finding that, although the employer of an independent contractor "may have retained control over particular aspects" of the independent contractor's work, he was not liable due to retention of control because he "did not supervise the relevant work"). Therefore, we agree with the District Court that NPPD did not retain control over the rotor-turning process and should not be held vicariously liable for Westinghouse's negligence under this theory.

Cook also argues that NPPD should be liable because it had a nondelegable duty to protect Cook from injury, and that the District Court erred in concluding otherwise. Under Nebraska law, an owner may not delegate to an independent contractor "the duty of due care when the independent contractor's work involves special risks or danger, including work that is dangerous in the absence of special precautions." Whalen, 570 N.W.2d at 541.[1] Cook claims the millwrights' work at

[1]The Nebraska Supreme Court employs the same analysis to determine whether a "special risk or danger" exists so that an employer should be vicariously liable for

CNS involved a special risk or danger for two reasons: (1) all activities within the contaminated area of a nuclear power plant involve a special risk; and (2) the combination of nuclear materials and "a heavy metal cable being pulled with great force" created a special risk or danger. See Cook's Br. at 11.

Cook first argues that as a matter of law a nuclear power plant operator has a nondelegable duty to protect against negligent conduct by independent contractors within the contaminated area. There is no Nebraska case law exactly on point, but we read Nebraska Supreme Court decisions as requiring a connection between the work being performed when the injury occurred and the special risk or danger. See Kime, 562 N.W.2d at 713 (quoting the Restatement (Second) of Torts § 416 cmt. d (1965) as requiring that a special or peculiar risk "must involve some special hazard resulting from the nature of the work done, which calls for special precautions"); Parrish v. Omaha Pub. Power Dist., 496 N.W.2d 902, 913 (Neb. 1993) (same). Where the Nebraska Supreme Court has recognized a nondelegable duty, the plaintiffs' injuries were caused or affected by the special risk or danger. See Anderson v. Nashua Corp., 519 N.W.2d 275, 283-84 (Neb. 1994) (finding a special danger where an employee was painting inside an underground storage tank and was injured when highly combustible gas emitted by the paint exploded); Parrish, 496 N.W.2d at 913 (finding a genuine issue of material fact regarding the existence of a special danger where an

an independent contractor's negligence and to determine whether a "peculiar risk" exists so that a general contractor should be vicariously liable for a subcontractor's negligence. See, e.g., Whalen, 570 N.W.2d at 541 (engaging in full "peculiar risk" analysis, then avoiding separate "special risk or danger" analysis by noting, "[W]e have already determined that this case does not involve a special risk or danger."); Parrish v. Omaha Pub. Power Dist., 496 N.W.2d 902, 911 (Neb. 1993) (referring to analysis later in the opinion regarding the existence of a peculiar risk instead of analyzing separately whether the work involved a special risk or danger). Therefore, in analyzing Nebraska law concerning the existence of a "special risk or danger," we also draw from sections of Nebraska Supreme Court opinions that evaluate the existence of a "peculiar risk."

employee, without a safety net or adequate flooring, was welding on a fifty-foot high portable platform and was killed when he fell).  Here, however, the presence of nuclear materials and radiation had no impact on the cause or nature of Cook's injuries.  We therefore agree with the District Court's conclusion that as a matter of Nebraska law NPPD is not vicariously liable for Westinghouse's negligence simply because Cook was injured within CNS's contaminated area.

Turning to Cook's second argument, we find that the District Court did not err when it concluded Cook had failed to prove that the combination of the nuclear power plant and the use of the heavy cable being pulled with great force created a special risk or danger.  As already noted, Nebraska courts look to the nature of the activity performed when the injury occurred, not merely the location of the work, to determine if a particular task involves a special risk or danger.  See Kime, 562 N.W.2d at 713.  Therefore, we focus on whether Cook showed the rotor-turning process itself constitutes a special risk or danger.

To prove a special risk or danger under Nebraska law, Cook must show that NPPD should have recognized the rotor-turning process created "a peculiar risk of physical harm to others unless special precautions [were] taken."  Parrish, 496 N.W.2d at 913 (quoting Restatement (Second) of Torts § 416); see also Kime, 562 N.W.2d at 713.  Trial testimony indicates that most of the millwrights had turned rotor shafts during previous outages at CNS and at other power plants, but there is no indication that during those outages injuries occurred or special precautions were taken to prevent injuries.  Cook himself did testify that on one occasion at a previous outage he used a pin that had some sort of shoulder or groove in which the choker fit, but Cook made no attempt to show this modification was to prevent a "peculiar risk" of injury.  Therefore, we find that Cook did not prove a special risk or danger that would create a nondelegable duty for NPPD to protect Cook from injury.  Cf. Kime, 562 N.W.2d at 713 (holding there was no special danger created by the transportation

-12-

of cattle in a tractor-trailer under normal conditions, and noting the plaintiff had failed to allege that the cattle were improperly secured).

None of the District Court's findings of fact is clearly erroneous and no errors of law appear. Accordingly, the District Court's entry of judgment in favor of NPPD on Cook's negligence claim is affirmed in all respects.

IV.

Finally, we review the District Court's entry of judgment in favor of Westinghouse on NPPD's indemnification cross-claim. Nebraska law governs with respect to this issue, and, as we have already stated, we review the District Court's determinations of state law de novo.

The Westinghouse-NPPD 1984 general services agreement contains an indemnification provision that was not altered by any subsequent agreements. This provision reads:

> Subject to the limits of insurance coverages required herein, [Westinghouse] shall indemnify and save [NPPD], and its officers, directors, and employees, harmless from and against all losses, and all claims, demands, suits, actions, payments, and judgements arising from personal injuries or otherwise, <u>brought or recovered against [NPPD] by reason of any negligence of [Westinghouse], its agents, servants, or employees</u>, in the execution of the work, including any and all expense, legal or otherwise, incurred by [NPPD] or its representatives in the defense of any claim or suit. This indemnification does not apply to liability arising from a) a nuclear incident or b) the negligence of [NPPD] or its representatives.

Agreement No. 84A-MS3 between Westinghouse and NPPD, General Services, art. XIV, § F (emphasis added). NPPD argues that we should look to the facts of the case

-13-

to determine "by reason of [whose] negligence" Cook's lawsuit was brought. Westinghouse, however, argues that we should look only to the language of the complaint.

Nebraska courts approach the interpretation of indemnification provisions in the same manner they do the interpretation of other contract provisions. See Union Pac. R.R. Co. v. Kaiser Agric. Chem. Co., 425 N.W.2d 872, 879 (Neb. 1988). Therefore, we first must consider objectively whether the indemnification provision contains an ambiguity. See Johnson Lakes Dev., Inc. v. Central Neb. Pub. Power & Irrigation Dist., 576 N.W.2d 806, 814 (Neb. 1998). We find the provision contains a latent ambiguity, and that the resolution of this ambiguity will determine whether NPPD is entitled to indemnification. If Westinghouse is correct and we should look only to Cook's complaint, we find that Cook alleged only that NPPD was negligent,[2] so NPPD cannot recover its losses from Westinghouse. If we instead look to the facts of the case, as NPPD advocates, we find that only Westinghouse's negligence caused Cook's injuries,[3] so NPPD should receive indemnification.

The parties did not introduce extrinsic evidence to clear up this latent ambiguity, and we have been unable to find Nebraska case law interpreting similar contractual language. We have found, however, cases from other jurisdictions holding that basing the application of such an indemnification provision on the actual facts of the case, and not merely on the language of the complaint, is the preferred

---

[2]Cook did not allege that Westinghouse or its employees' negligence caused his injuries because Nebraska law made workers' compensation, which Cook had already received, the exclusive remedy against Westinghouse. See Brown v. AT&T Co., 560 N.W.2d 482, 485 (Neb. 1997).

[3]The District Court found that Westinghouse's negligence caused Cook's injuries, see Memorandum and Order at 18 (stating "the cause of Cook's injuries was Westinghouse's use of an undersized pin"), and we upheld that determination in Part II of this opinion.

interpretation where no contrary intent appears. For example, the Delaware Supreme Court in Pine Creek Chiropractic Center, P.A. v. Robinson, 637 A.2d 418 (Del. 1994), explained that looking only at the language of the plaintiff's complaint would ignore what the parties appear to have intended, that the indemnitee should not suffer a loss because the indemnitor was negligent. To quote from the Pine Creek Chiropractic decision, substituting "Westinghouse" and "NPPD" for the names of the parties in that decision,

> Since [Westinghouse] expressly agreed to indemnify [NPPD] for [Westinghouse's] acts and omissions, and [NPPD]'s loss (litigation expenses) is a direct result of [Westinghouse's] . . . negligence, [NPPD] is entitled to its bargained-for indemnification. To hold otherwise would deprive [NPPD] of its contractual right to be held harmless and indemnified for [Westinghouse]'s acts or omissions simply by virtue of the meritless pleading allegations of a third party. Accordingly, we hold that in an express indemnification context . . . , where the indemnitee is free from actual wrongdoing, the indemnitee is entitled to be made whole for all losses suffered due to the conduct of the indemnitor, even those attributable to unfounded allegations of the indemnitee's independent negligence.

Id. at 422. We find this reasoning persuasive, and believe the Nebraska Supreme Court would adopt the same reasoning to resolve the ambiguity in the Westinghouse-NPPD indemnification provision because such a resolution seems to reflect best the intentions of the parties. Cf. Hammann v. City of Omaha, 417 N.W.2d 323, 327 (Neb. 1987) (stating that a contract should be interpreted "so as to give effect to the intentions of the parties thereto and carry out rather than defeat the purposes for which they were executed") (quoting Matula v. City of Omaha, 390 N.W.2d 500, 502 (Neb. 1986)). Therefore, we conclude that Westinghouse is obligated by the indemnification provision in the 1984 general services agreement to indemnify NPPD for the losses NPPD incurred in defending against Cook's suit. The District Court's

-15-

judgment in favor of Westinghouse on NPPD's indemnification cross-claim is reversed.

V.

In sum, we affirm the District Court's judgment in favor of NPPD on Cook's negligence claim and reverse the District Court's judgment in favor of Westinghouse on NPPD's indemnification cross-claim. The case is remanded to the District Court for a determination of the amount Westinghouse owes NPPD under the indemnification provision, and for entry of judgment in favor of NPPD on its indemnification claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.